Argued September 29; reversed December 29, 1936;
rehearing denied March 9, 1937

# GEO. B. WALLACE CO. ET AL. *v.* INTERNATIONAL ASSOCIATION OF MECHANICS, MT. HOOD LODGE, LOCAL NO. 1005, AUTO MECHANICS, ET AL.

(63 P. (2d) 1090)

In Banc.

B. A. *Green* and *K. C. Tanner,* both of Portland (Green, Tanner, & Boesen, of Portland, on the brief), for appellants.

*R. M. Burley,* of Portland; for respondent Geo. B. Wallace Co.

*Maurice W. Seitz,* of Portland, for respondent A. B. Smith Chevrolet Co.

*Will H. Masters,* of Portland, for respondent Wentworth & Irwin.

BELT, J. These three suits—which were consolidated for hearing in the lower court and on this appeal —were commenced by plaintiffs to enjoin the defendant

officers of Mt. Hood Lodge Local No. 1005 from picketing their places of business in the city of Portland. The plaintiffs are engaged in the sale, servicing and repairing of automobiles. On May 11, 1936, defendants called a strike of union automobile mechanics in the city of Portland and proceeded forthwith to picket various places of business engaged in the repairing of automobiles. From a decree enjoining picketing in each of the above cases, the defendants appeal.

It appears from the uncontradicted evidence that A. B. Smith Chevrolet has 32 mechanics employed to service and repair new automobiles; that no employee was a member of any labor union and had no desire to become such; that the employees were satisfied and no dispute existed between them and their employer over wages, hours, or working conditions; that no employee responded to the call to strike and that the plaintiff maintained what he said was an "open shop" and did not discriminate against union labor.

On the day following the strike, the defendants caused one picket to patrol in front of the Chevrolet Company's place of business on 13th street and one to patrol on Couch street, each bearing a banner, "Strike On, Unfair to Auto Mechanics' Local No. 1005, A. F. & L." After suit was started, that part of the banner having the words, "Strike On", was folded under so as not to be visible. There is no contention that the picketing involved violence. There was evidence, however, that some unknown persons across the street were listing the license numbers of automobiles of customers who came to plaintiff's place of business.

It further appears from the uncontradicted evidence that the Chevrolet Company paid its mechanics under the piece-work system, i. e., that the employee

received 40 per cent of the standardized charge of $2 an hour made to the public and that the average pay to an employee under such basis was $160 to $165 a month. Under this plan, the customer was quoted a price in advance and the length of time required to do the job was immaterial. Of course, the pay of the employee depended somewhat upon the speed with which he worked. The average mechanic under such basis would earn 80c an hour. A slow worker would earn less than 80c an hour and the speedy one would earn in excess of such rate. No extra pay was allowed for overtime and the standard work week was 5½ days of eight hours a day, or 44 hours.

The standard fixed by the union was on the basis of 40 hours a week at the rate of 90c an hour, with extra pay for overtime. Under the union scale, the employee would receive $156 a month and additional pay if overtime work were done.

Plaintiff-respondents assert that the variance from the union standards affords no basis for a labor controversy and that the real objective is the unionization of their shops. The defendants, on the other hand, deny that the picketing was conducted to compel plaintiffs to operate a "closed shop" and assert that the standards maintained by plaintiffs tend to undermine and defeat the cause of organized labor. Defendants urge that the hourly wage system best promotes the general welfare of the laboring man.

The facts in the Wentworth & Irwin case, so far as the application of the law is concerned, are not materially different from those in the Chevrolet Company case. In the Geo. B. Wallace Co. case the facts are to be differentiated in that some of the employees were members of the union and there is evidence tend-

ing to show that a majority of the employees "seemed to prefer to work by the hour rather than on the percentage basis". Furthermore, four of the employees of the Wallace Co. went out on call of the strike.

The defendant-appellants urge that, under and by virtue of chapter 355, Oregon Laws for 1933, they are immune from an injunctive order or decree in that a "labor dispute" existed within the meaning of the act and that the picketing was conducted "without fraud or violence and/or intimidation". The plaintiffs contend that, under a proper construction of the above act, no "labor dispute" was involved and hence the act has no application. Plaintiffs further contend that if the act is construed as being applicable, it is unconstitutional. Plaintiffs' contention that no labor controversy is involved within the meaning of the act is based upon the fact that there was no immediate dispute between employer and employee. It is also urged in reference to the Wallace Co. case that the evidence discloses violence and intimidation.

It will thus be seen that the decision hinges primarily upon the construction and constitutionality of the legislative enactment of 1933. The act in question is entitled "An Act declaring the public policy of the state of Oregon regarding the relationship of employers and workmen, and defining and limiting the jurisdiction of the courts of this state in relation thereto". Section 1 provides in substance that no court shall issue any injunction in a case "involving or growing out of a labor dispute", except in strict conformity with the provisions of the act. Section 2 thus declares the public policy of the state:

"Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in a corporate and

other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization and designation of representatives of his own choosing to negotiate the terms and conditions of his employment and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of this state hereby are enacted."—

and admonishes courts to interpret the act in accordance with such declaration of public policy.

Section 3 purports to invalidate what are commonly known as "Yellow Dog Contracts". Since such contracts are not in issue, the provisions of this section will not be set forth.

Section 4 deprives courts of the power to issue an injunction in any case "involving or growing out of any labor dispute" and specifically immunizes from injunction certain acts whether done singly or in concert, among which are: (Subdivision 5) "Giving publicity to the existence of, or facts involved in, any labor dispute, whether by advertising, speaking, patroling or by any other method *not involving fraud or violence and/or intimidation*". Note: It will be observed that courts are not precluded from granting equitable relief where fraud, violence or intimidation is involved.

Sections 5 and 6—Not material to issues involved.

Sections 7–12 inclusive pertain to the procedure in the lower court and on appeal where injunctive relief is sought.

Section 13.

"1. A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft or occupation; or have direct or indirect interests therein, or who are employes of the same employer, or who are members of the same or an affiliated organization of employers or employes, whether such dispute is (a) between one or more employers or associations of employers and one or more employes or associations of employes, (b) between one or more employers or associations of employers and one or more employers or associations of employers, or (c) between one or more employes or associations of employes and one or more employes or associations of employes, or when the case involves any conflicting or competing interests in a labor dispute, as hereinafter defined, of persons participating or interested therein, as hereinafter defined.

"2. A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer or agent of any association composed in whole or in part of employers or employes engaged in such industry, trade, craft or occupation.

"3. The term 'labor dispute' includes any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate relation of employer and employe.*"

Section 14 provides in substance that if any provision of the act be declared unconstitutional it shall not affect the remaining provisions of the act.

The above act was copied almost verbatim from the Norris-La Guardia Act (29 U. S. C. A. §§ 101-115) passed by Congress in 1932. The only difference is that the state legislature saw fit to add the words, "and/or intimidation" in subdivision 5 of section 4. It is significant to note that, after a lapse of only a few years, not less than sixteen other states have enacted legislation substantially following the provisions of the federal act.

Since chapter 355, Oregon Laws for 1933, and the federal act are substantially the same, we may reasonably assume that the legislature of this state had the same intention as had Congress in the enactment of such legislation. To ascertain what Congress had in mind and the evils, if any, it sought to remedy, it is well briefly to review the history of legislation pertaining to labor injunctions. In 1914, the Clayton Act (29 U. S. C. A. § 52) was passed by Congress and it was generally hailed by labor as its Magna Charta. Organized labor, however, was doomed to disappointment as the United States Supreme Court in *Duplex Printing Press Co. v. Deering,* 254 U. S. 443 (65 L. Ed. 349, 41 S. Ct. 172, 16 A. L. R. 196), construed section 20 of the act as granting immunity from injunctions in labor controversies only when the dispute existed between employer and employee. The court held that the act must be confined "to those who are proximately and substantially concerned as parties to an actual dispute respecting the terms or conditions of their own employment, past, present or prospective". After the Clayton Act was passed, numerous states enacted anti-injunc-

tion legislation substantially following the federal act. See §§ 49-901–49-906, Oregon Code 1930. The state courts including that of Oregon quite universally followed the construction of the United States Supreme Court and held that a labor dispute could exist only where there existed the relationship of employer and employee.

After the decision in the Duplex case was rendered, injunctions in labor controveries seemed to be the order of the day. Many disinterested persons were highly critical of the courts because of such intervention. Congress was besieged with various bills seeking to restrict the power of courts to issue injunctions in cases involving dynamic social and economic problems. In the great economic struggle between capital and labor, the decided trend of public opinion seemed to be towards the conviction that labor is entitled, through the medium of collective bargaining, to a greater recognition of its rights and that legislation should be enacted further to foster the welfare and interests of the wage-earner. This crystallization of public opinion in favor of the man who earns his livelihood by the sweat of his brow culminated in the passage of the Norris-La Guardia Act. See: The Labor Injunction by Frankfurter and Greene. Also Oakes on Organized Labor and Industrial Conflicts; 84 Pa. Law Review 771; 30 Mich. Law Review 1257; 16 Minn. Law Review 638.

■ The enactment of the Norris-La Guardia Act and laws patterned after it undoubtedly marks the dawn of a new era in the domain of labor injunctions. Whether such legislation is in the best interests of the commonwealth is a legislative and not a judicial question. The function of the court is to declare the law

as it is and not what it thinks it ought to be. Of course, if the act is clearly unconstitutional, the court should not hesitate so to declare; but, if not invalid, the act should be given full force and effect and not be whittled away by judicial construction. Too often drastic laws are passed with the apparent expectation that when litigation arises out of their application courts will so construe them, in the face of plain and explicit language to the contrary, that no hardship will result. Needless to say, under our Constitutional system of government, such is not the function of the judiciary.

■■ The right of labor to organize and to engage in collective bargaining is now universally recognized. How far a labor organization may go in the furtherance of its interests is a matter, however, upon which courts disagree. To attain their objectives such organizations at times resort to the strike and picketing. A few courts still look upon picketing as wrongful per se and an unlawful interference with the right of the employer to transact business. They hold, in effect, that there can be no such thing as lawful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching. The great majority of courts, including the United States Supreme Court (*American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184 (66 L. Ed. 189, 42 S. Ct. 72, 27 A. L. R. 360)), however, sustain the right of peaceful picketing. The doctrine that picketing is necessarily a species of coercion and intimidation is dogma long since discarded (*Exchange Bakery & Restaurant Inc. v. Rifkin,* 245 N. Y. 260 (157 N. E. 130); *Goldfinger v. Feintuch,* 288 N. Y. S. 855). If merely peaceful picketing were in and of itself coercion, there could never be peaceful picketing in any case, for coercion is never

lawful. As stated in *Bayonne Textile Corp. v. American Federation of Silk Workers,* 116 N. J. Eq. 146 (172 Atl. 551, 92 A. L. R. 1450):

"The modern view is that picketing is not per se unlawful and should not be enjoined if peacefully carried on for a lawful purpose."

■ This court has long recognized the right of peaceful picketing when done for a lawful purpose: *Blumauer v. Portland M. P. O. P. Union,* 141 Or. 399 (17 P. (2d) 1115); *Moreland Theatres Corporation v. M. P. Union,* 140 Or. 35 (12 P. (2d) 333); *Crouch v. Central Labor Council,* 134 Or. 612 (293 P. 729, 83 A. L. R. 193); *Greenfield v. Central Labor Council,* 104 Or. 236 (192 P. 783, 207 P. 168). It is an appeal to the public and to members of the union not to patronize an employer who does not conform to the standards of organized labor relative to wages, hours and conditions of employment. The mere fact that an employer may sustain loss of business as a result of such picketing does not warrant intervention. It is damnum absque injuria. No person has a vested right to the patronage of those who are not in accord with his standards of employment: *United Chain Theatres v. Philadelphia M. P. M. O. Union,* 50 F. (2d) 189; *S. A. Clark Lunch Co. v. Cleveland Waiters & Beverage Dispensers Local,* 22 Ohio App. 265 (154 N. E. 362). Such loss, under our social and economic system, is merely the result of a conflict of interests between capital and labor. What has been said thus far is on the assumption that violence, intimidation and coercion are foreign to peaceful picketing. No court has ever upheld the right to injure or destroy a business through a tortious act.

■ We agree fully with the contention of the plaintiffs that there must be a reasonable justification for

picketing. There must be an actual bona fide dispute. Picketing must be peacefully carried on and it must be, for a lawful purpose. When the purpose of picketing is to injure or destroy a business rather than to further the common interests of the worker, it is an unlawful interference with the property rights of the employer and should be enjoined: *Blumauer v. Portland M. P. M. O. P. Union,* supra.

■■ The decisions of this court are not clear as to whether there can be picketing in the absence of a strike: *Moreland Theatres Corporation v. M. P. Union,* supra; *Greenfield v. Central Labor Council,* supra. Without any attempt to reconcile all that has been said on the subject, we think the better reasoned cases are to the effect that a strike and picketing are not necessarily concomitant. There may be a strike without picketing and picketing without a strike. Each is a combative weapon which labor may use to accomplish its objectives if the same be lawful. The mere fact, therefore, that no strike existed, so far as the Chevrolet Company and Wentworth & Irwin are concerned, does not in itself preclude the defendants from picketing the plaintiffs' places of business: *Exchange Bakery v. Rifkin,* supra.

Having expressed our views relative to the law applicable to picketing, we come to the vital question: Do the facts disclose a labor dispute within the meaning of the statute? We are convinced that the Norris-La Guardia Act—after which our statute was patterned —was designed to overcome the interpretation given to the Clayton Act by the United States Supreme Court in *Duplex Printing Press Co. v. Deering,* supra. The Senate and House Committee reports so indicate: Senate Report No. 163, 72d Congress (1932); H. R. Report No. 669, 72d Congress. If the Norris-La

Guardia Act does not place greater restrictions upon the power of courts to issue injunctions in industrial controversies, the enactment of the law—aside from its provisions relative to "Yellow Dog Contracts"—was indeed vain and idle.

■■ Clearly one of the principal purposes of the act was to protect labor from the abuses of unrestrained issuance of injunctions in industrial controversies. The act is a plain mandate to the courts not to grant equitable relief in labor disputes, unless fraud, violence, or intimidation is involved. To relieve any doubt as to what constitutes a labor dispute, the legislature not only defined the same under subdivision 3 of section 13 of the act but also provided in the preceding subdivision of the same section what person or association shall be deemed to have participated in such dispute. The definition of a labor dispute is so broad and comprehensive that it undoubtedly extends the scope of the Clayton Act as interpreted by the United States Supreme Court by placing a greater restriction upon courts in the matter of issuing injunctions. We are convinced that the immunity from injunctions clearly extends to disputes between persons engaged in the same industry or craft who have a "direct or indirect" interest therein, and is not limited to disputes between an employer and his immediate employees. The act provides that an association of employees has an interest in a labor dispute, "*regardless of whether or not the disputants stand in the proximate relation of employer and employee*". If there were any doubt as to the intention of Congress in enacting the Norris-La Guardia Act it ought to be removed by the following language of the report of the House Committee on the Judiciary, favoring the passage of the bill:

"Section 13 contains definitions which speak for themselves. It is hardly necessary to discuss them other than to say that these definitions include, as hereinabove stated, a definition of a person participating in a labor dispute which is broad enough to include others than the immediate disputants and thereby corrects the law as announced in the case of Duplex Printing Co. v. Deering, supra, wherein the Supreme Court reversed the circuit court of appeals and held that the inhibition of section 20 of the Clayton Act only related to those occupying the position of employer or employee and no others."

Also note the following language of the Senate Committee on the Judiciary:

"Section 13 of the bill defines various terms used in the act, and it is not believed that any criticism has been or will be made to these definitions.

"The main purpose of these definitions is to provide for limiting the injunctive powers of the Federal courts only in the special type of cases, commonly called labor disputes, in which these powers have been notoriously extended beyond the mere exercise of civil authority and wherein the courts have been converted into policing agencies devoted in the guise of preserving peace, to the purpose of aiding employers to coerce employees into accepting terms and conditions of employment desired by employers.

"The proposed bill is designed primarily as a practical means of remedying existing evils and limitations are imposed upon the courts in that class of cases wherein these evils have grown up and become intolerable. This is a reasonable exercise of legislative power, and in order that the limitation may not be whittled away by refined definitions of what persons are to be regarded as legitimately involved in labor disputes, the bill undertakes specifically to designate those persons who are entitled to invoke the protections of the procedure required."

To restrict the act to controversies between employer and employee would run counter to the plain

intent of the legislature and would undoubtedly defeat the very purpose of labor organizations having as objectives improved standards in wages, hours and conditions of labor. In considering the Clayton Act, Mr. Chief Justice Taft, speaking for the court in *American Foundries v. Tri-City Trades Council,* supra, said:

"The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda without more, to be without excuse and malicious."

Is it probable that the court would depart from such reasoning upon a consideration of the clear and explicit provisions of the Norris-La Guardia Act?

The mere fact that the employees are not complaining against the terms and conditions of employment under which they are working is not conclusive. In many instances where sweatshop conditions prevail —although not in the instant cases—the employee, through the greed and avarice of capital, is bound down in abject physical and mental slavery. It is idle to talk about the protest of the individual laborer under such conditions. How can an employee exercise freedom of thought and expression when hungry children are dependent upon him for support? Protest against

terms and conditions of employment with some employers simply means that the wage earner goes home without a job. It is through concerted action and collective bargaining that the laborer hopes for some semblance of economic freedom.

On the other hand, the court is not unmindful that organized labor has, in some instances, assumed a domineering and dictatorial attitude inimical not only to the best interests of labor but to the general public. It is only when capital and labor have due regard for the rights of each other that a wholesome condition exists. When selfishness and greed prevail, the innocent public in most instances suffers most. To devise more efficient and expeditious methods for the adjustment of differences in these industrial controversies has ever been a vexatious problem for the legislative branch of the government and, like Banquo's ghost, it will not down. Whatever may be the best solution of the problem, we are convinced it is not through government by injunction.

That the act in question is not confined merely to a labor dispute between an employer and his immediate employees, see: *Levering & Garrigues Co. v. Morrin,* decided in 1934, 71 F. (2d) 284, certiorari denied in 293 U. S. 595; *Dehan v. Hotel and Restaurant Employees etc. Local Union,* (La.), decided in 1935, 159 So. 637; *Cinderella Theatre Co. v. Sign Writers' Local Union,* (Dist. Court, Mich.), 6 F. Supp. 164; *American Furniture Co. v. I. B. of T. C. and H. of A.,* (Wis.), decided in 1936, 268 N. W. 250; *Fenske Bros. v. Upholsterers' Int. Union,* 358 Ill. 239 (193 N. E. 112, 97 A. L. R. 1318); *Miller Parlor Furniture Co. v. Furniture Workers' Industrial Union,* decided in 1934 (Dist. Court, N. J.), 8 F. Supp. 209; *Scofes v. Helmar,* 205 Ind. 596 (187 N. E.

662); *Wisconsin State Federation v. Simplex Shoe Mfg. Co.*, 215 Wis. 623 (256 N. W. 56); *Goldfinger v. Feintuch,* decided June 11, 1936, 288 N. Y. S. 855; *Exchange Bakery Co. v. Rifkin,* supra; *Nann v. Raimist,* 255 N. Y. 307 (174 N. E. 690, 73 A. L. R. 669); *Stillwell Theatre v. Kaplan,* 259 N. Y. 405 (182 N. E. 63, 84 A. L. R. 6). It is true that the last three cases above cited did not involve legislation patterned after the federal act but the reasoning in all of them strongly supports the construction which we have given to the statute in question.

The statutory definition of a "labor dispute" (subdivision 3, § 13, chapter 355, Oregon Laws 1933) is broad enough to include any controversy relating to conditions of employment or industrial relations *regardless of whether or not the disputants stand in the proximate relation of employer and employee.* Notwithstanding the plain and specific language of the statute, it is argued, however, that the above italicized clause was merely intended to permit a labor union to come to the aid of its members or at the most workmen who are engaged in a labor dispute. In answering this contention the Supreme Court of Wisconsin in *American Furniture Co. v. I. B. of T. C.,* supra, said:

"It is the *disputants* who need not stand in the relation of employer and employee. Plaintiff's contention implies that basically the disputants must be the employer and the employees, whereas the act plainly indicates that the disputants, that is to say, the principals to a labor dispute, need not stand in the relation of employer and employee."

Under the construction as contended for by plaintiffs a labor union would absolutely be prohibited from protesting against low wages, long hours, or unsanitary conditions of a sweatshop, because, peradventure, non-union employees were "satisfied" to continue to

work under such conditions. Can it reasonably be contended that a labor union has no interest in such industrial relations? Are we to so construe the statute that an organization of workmen united for the purpose of raising the standards of labor must stand idly by and see its cause undermined and defeated merely because there is no immediate dispute between employer and employee?

In *United Electric Coal Companies v. Rice,* 80 F. (2d), 1, language may be found tending to support the contention of respondents herein, but that case involved a controversy between two labor unions. It was not a controversy over hours, wages, or labor conditions, as in the instant case. Hence it is not applicable. The same may be said in reference to *Lauf v. Shinner & Co.,* 82 F. (2d) 68.

Defendants also urge that the decision of this court sitting in banc in *Blumauer v. Portland M. P. O. P. Union,* supra, requires a reversal of the decrees enjoining picketing in the instant cases. In the Blumauer case, a moving picture business was operated under a lease by C. M. Dunn, Inc. The employer reduced the wages of certain moving picture operators below the wage scale of the union. The employees refused to accept such wage reduction and quit their employment. Non-union operators were secured to carry on the work. The union thereupon picketed the place of business as being "Unfair to Organized Labor". The lessee became financially involved and the lessor took over the theatre and continued operation. Picketing continued. Thereupon suit for injunction was instituted.

In that case, as here, the plaintiff asserted the object and purpose of the picketing was to compel recognition

of the union. The defendant labor organization contended that the purpose was "to make appellants pay the union scale of wages regardless of whom they may hire". The union, there as here, offered to withdraw the pickets if the employer would comply with the union scale of wages. Chief Justice CAMPBELL, speaking for the court in an opinion from which there was no dissent —the personnel of the court being the same as now exists—said:

"Organized labor has a right to lawfully use all lawful means to bring about reasonably desirable terms and conditions in the way of hours, pay or other conditions of employment. Organized labor has the right to present its side of a controversy to the public by all lawful means if such means may be, and are, used in a lawful manner without violence, or threats, or intimidation of the employer, his employees or the patrons of the employer's business.

　　　*　　　*　　　*　　　*　　　*　　　*

"This right of presenting its side of a controversy, organized labor may exercise by lawful means, in a lawful manner *when its members have reasonable grounds to apprehend that the practices or pay of any employer will produce an injurious effect on the working conditions of employees generally, or of those in a particular trade or calling, even though there may be no direct controversy between the employer and his immediate employees.*" [Italics ours.]

It is true that this decision was rendered a few months prior to the enactment of the statute under consideration and it may well be argued that, in some particulars, it can not be reconciled with prior decisions of this court. It is, nevertheless, the last expression of this court on the subject of the labor injunction and is supported by reputable authority: *Exchange Bakery Co. v. Rifkin,* supra. Certainly if the Blumauer deci-

sion was good law at the time it was rendered, it is doubly so now, in view of the public policy of the state as declared in chapter 355, Oregon Laws for 1933. It will be recalled that in the Blumauer case no member of the union was an employee of the plaintiff seeking injunctive relief at the time picketing was carried on.

■ In our opinion, the statute thus construed is applicable. The defendants have "direct or indirect" interests in the terms and conditions of employment regardless of whether or not they "stand in the proximate relation of employer and employee". By reason of the difference between the standards maintained by the plaintiffs and those fixed by the defendants, a "labor dispute", within the meaning of the statute, exists. It is not for this court to say who is right in this industrial controversy. The court is not prepared to say that the standards advocated by the defendant are so unreasonable as to indicate a purpose to injure the plaintiffs rather than to promote the interests of the labor organization. It is a question upon which reasonable minds might differ. Under such circumstances the policy of the state, as expressed in the act, is noninterference in this conflict of interests, so long as neither side resorts to unlawful methods in seeking its objective. It may be that the statute, in its application to the plaintiff employers, operates harshly, but the matter rests with the legislature and not with the court.

■ Relative to the Geo. B. Wallace Co. case there is some evidence of isolated incidents of intimidation, but we think there is no reasonable apprehension of their continuance. We disapprove of taking the license numbers of automobiles belonging to customers of the plaintiffs, as it may reasonably be interpreted by such customers as an implied threat to do them injury and

thereby interfere with the right of the plaintiffs to transact business. Following the employees home by patrol cars must be avoided. Crowds of union men or sympathizers should not be permitted to loiter in front of business places as such may intimidate customers. "Mass picketing" is unlawful. There must be no interference with employees who wish to work nor with the public desiring to transact business with the plaintiffs. The non-union man has the right to go through a picket line without being subjected to intimidation or violence. The right of free ingress to and egress from the plaintiffs' business establishments must be maintained inviolate. Otherwise, there would be an unlawful interference with the right of plaintiffs to transact business.

The court has recognized the right of peaceful picketing, but it must be such in truth and in fact. If the defendants do not practice peaceful picketing in the light of what this court has said, plaintiffs may apply for injunctive relief.

Is the statute as thus construed unconstitutional? Plaintiffs challenge the validity of the act upon three grounds, viz: (1) It is class legislation and denies equal protection of the laws; (2) It violates the due process clause of the federal and state Constitutions; (3) It deprives courts of the inherent power to grant equitable relief. These same objections against the validity of the act were urged by complainants in a companion case of *Starr v. Laundry and Dry Cleaning Workers' Local Union*, ante p. 634, this day decided, but the constitutionality of the act was sustained. We see no need of repetition.

The decrees of the lower court granting injunctive relief are reversed, but the suits will not be dismissed

pending the picketing. The lower court will retain jurisdiction to grant injunctive relief in the event that picketing is not conducted in a lawful manner.

Neither party is entitled to costs and disbursements.

RAND, J. (dissenting). The questions involved upon these appeals are whether a labor dispute within the meaning and intent of chapter 355, Laws 1933, was shown to exist at the time these suits were commenced, and, if so, is that act constitutional?

The act contains the same limitations upon the powers of the courts of this state that the federal act, commonly known as the Norris-La Guardia Act does in respect to the powers of the federal courts, but, under the express provisions of the act, these limitations apply only to the cases growing out of or involving a labor dispute and, in the absence of such a dispute, the act has no application. Hence, if the act does not apply, the question of whether it is constitutional is not involved.

The term "labor dispute" implies some controversy or dispute between an employer and his employees and must of necessity grow out of some dispute involving that relationship. In *Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322 (51 P. (2d) 372), *United Electric Coal Companies v. Rice,* 80 F. (2d) 1, and *Lauf v. E. G. Shinner & Co.,* 82 F. (2d) 68, it was held that an act identical in terms with ours does not apply to a case where the relation of employer and employee does not exist. In the first case, the court said:

"The vital, controlling question at issue here is plain and easy of solution. It in no way pertains to the relations between the appellant, a merchant and its em-

ployees. For aught that appears, they are content and satisfied, among themselves. On the contrary, this is a lawsuit between appellant and a third party—a labor union that does not include in its membership any employee of the appellant. What right have the respondents to insist or demand, at the threat or cost of the destruction of appellant's business, or at all, that appellant ask, urge, or coerce, directly or indirectly, its employees who are at liberty to do as they please, to join respondents' organization? Of course, there is nothing unlawful in hiring clerks or salesmen who are not members of a local organization such as the respondent, and any attempt, like that in this case, to deny or cripple one's rights to do so, is an unwarranted attempt by individuals or persons to unreasonably interfere with the freedom of the liberty and property right of contract.

"The conduct of respondents, in conjunction with that of appellant, cannot be termed a labor dispute. It is an unwarranted attempt on the part of respondents to compel appellant, against its right of choice, to become active in the cause of respondents, with the result that, upon the failure of that attempt, respondents purposely commenced and continued picketing to appellant's damage in the large sum of $2,200, in less than four months' time, with the avowed intention of continuing the same, to manifest irreparable injury and damage to the appellant.

"Under the facts and circumstances, the appellant is entitled to the remedy demanded in its complaint, including judgment for damages to the extent found by the trial court."

In the second case, the real controversy was between two unions and the employer to determine which union should represent the employees of the United Electric Coal Companies, which, the decision says, was an innocent bystander. In that case there was no dispute between the employer and its employees. The wage scales and working conditions were satisfactory to the

employer and the employees alike, and the employer was prevented by the struggle between the two unions from operating its mine. In defining what constitutes a labor dispute within the meaning of the federal act, the court said:

"Do the facts present a case 'growing out of a labor dispute' or which is 'involved in a labor dispute', as those two phrases are used in the Act?

"Looking to the purpose, as well as to the words, of the Act, we are satisfied that the term 'labor dispute' should be most broadly and liberally construed. The term 'labor disputes' comprehends disputes growing out of labor relations. It infers employment—implies the existence of the relation of employer and employee. Disputes between these parties are the general subject matter of this legislation. All such disputes seem to be clearly included.

"Equally clear we think must be the conclusion that the dispute referred to in the statute *must* be one between the employer and the employee or growing directly out of their relationship. It does not apply to disputes between employees or to disputes between employee unions to which employer is not a real party. The employer is not precluded from invoking the jurisdiction of a Federal court of equity unless it appears that it was in some way a party to the dispute, between two unions.

"Confirmation of this conclusion may be found in the other sections of the Act which clearly indicate that the entire Act had reference to controversies over wages and conditions of employment which arise between employer and employee and result in strikes or threatened strikes which work hardships upon the innocent third party—the public.

"In seeking to avoid strikes, it was to be expected that arbitration would be encouraged and resort to court proceeding discouraged. It is quite apparent that the employer has nothing to arbitrate and no use for conciliators when it and its employees are in accord. It is hard to see what sort of arbitration or conciliation

was intended if the legislation referred to anything other than to strained or striking relationships between employer and employee over wages and conditions of employment. Where the difference is between two unions, each striving to contract with the employer, and there is no controversy as to terms of employment with said employer, we are unable to see where any labor dispute exists to which the employer is a party.

"Of course, there may be a seeming controversy between two unions which is in reality merely a labor dispute between the employer and the employees. Such a situation falls within the meaning of the term 'labor dispute'. The employer may not avoid inclusion in a labor dispute if he participates in union activity which directly or indirectly influences or affects employment relations."

In the Lauf case, the court said:

"Both the federal and state enactments are applicable only to cases involving or growing out of labor disputes, and the first question urged here is whether the facts presented constitute such a case. Appellants contend for an affirmative answer and appellee urges a negative answer.

"Under the authority of United Electric Coal Companies v. Rice, et al., 80 F. (2d) 1, decided by this court at its present term, the question must be answered in the negative. We there held that the labor dispute designated in the Norris-La Guardia Act referred to a labor dispute between the employer and the employee and did not apply to disputes between employees or to disputes between employee unions to which the employer was not a real party. There the dispute was between the regular union which was the United Mine Workers of America, and a recently organized union which styled itself the Progressive Miners of America. Members of both unions were employees of the employer, and all, or practically all, of the employees were members of the United when the Progressive was organized. The dispute was of such magnitude that it was beyond control of the unions or the local officers.

The employer was in no manner involved, except that it was suffering enormous damage without fault on its part. Both unions were satisfied with wages, hours, and conditions, and the strike was called merely because the employer would not cancel its contract with the United, and enter into a like contract with the Progressives. Under those circumstances the court enjoined the Progressives, and protected the sanctity of the contract and held that there was no labor dispute in which the employer was engaged or for which it was in any manner responsible.

"In the case at bar, the facts are quite analogous to those in the United Electric Case. In each case the real controversy was between the two unions, and the innocent employer suffered the damage. The instant case, however, is stronger for the employer in that not one of appellee's employees is a member of the appellant union. Indeed, neither the employer nor any of his employees are engaged or involved in a labor dispute with anyone. The controversy, rather, seems to be a unilateral one with the sole object of coercing appellee to compel its employees to join the appellant union, in order that it may represent the employees in their dealings with the employer. Appellants seek to accomplish that result by picketing and damaging the employer's business. But, under the Norris-La Guardia Act and the Wisconsin Labor Code, it would amount to a violation of both the federal and state law if appellee complied with appellants' demands, for under those laws the employer is specifically enjoined from influencing his employees in their choice of a union or their representative. The employees have refused to join the appellant union, they have organized their own union and have selected their own representative without interference or participation of their employer, and their rights in these respects are as fully protected by the laws as are those of appellants.

"The declared public policy of both the nation and State of Wisconsin establishes the substantive rights of appellee's employees which the courts will protect

by injunction, though no specific provision therefor be contained in either Act. Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034; Trustees of Wisconsin State Fed. of Labor v. Simplex Shoe Mfg. Co., 215 Wis. 623, 256 N. W. 56. It being unlawful for appellee to dictate to its employees what organization they should join, or what representative they should select, and likewise unlawful to refuse to recognize the agency which they had selected, and recognize another representative which they had rejected, it follows that appellants' demand upon appellee was unlawful.

"In Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375, the Court said:

" 'Plaintiffs' business is a property right * * * and free access for employees, owner, and customers to his place of business is incident to such right. Intentional injury caused to either right or both by a conspiracy is a tort. Concert of action is a conspiracy, if its object is unlawful or if the means used are unlawful.'

"Hence it was held that picketing to accomplish a purpose which was unlawful was a tort which would be enjoined. True, that opinion was by a divided court, but there was no disagreement over the following statement which appears in one of the dissenting opinions:

" 'The employer has, of course, a legal right to carry on his business for profit, and incidentally the subsidiary right to secure and retain customers. * * * This right to carry on business—be it called liberty or property—has value, and he who interferes with the right without cause renders himself liable.'

"The sum of appellants' contentions is that under the broad terms of the acts in question, appellants have a right to attain their ends by picketing at any time or place. The statutes are not fairly subject to any such construction. As stated in Truax v. Corrigan, supra, there must be a cause for such interference with business. Here there was no semblance of such cause, for there was no labor dispute between appellants and

appellee because the relationship of employer and employees and their associates did not exist. United Electric Coal Companies v. Rice et al., supra.

"As supporting a contrary doctrine, appellants rely upon American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 S. Ct. 72, 78, 66 L. Ed. 189, 27 A. L. R. 360. In speaking of the union's rights and interests, the Court said:

" 'Employees must make their combination extend beyond one shop * * * because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership.'

"In the case before us, the union's right to increase its membership is not questioned, even to the point of including appellee's employees if it can do so. The Court in the Tri-City Case referred to the case of Lucke v. Clothing Cutters' & Trimmers' Assembly, 77 Md. 396, 26 A. 505, 19 L. R. A. 408, 39 Am. St. Rep. 421, which held '* * * that the state law authorizing formation of Trade Unions * * * was not a warrant for making war upon the nonunion man or for illegal interference with his rights and privileges.' We can not think that either Congress or the Wisconsin Legislature intended to increase the union's rights in this respect.

"Appellants also rely upon Levering & Garrigues Co. v. Morrin (C. C. A.) 71 F. (2d) 284; Cinderella Theater Co. v. Sign Writers' Local Union (D. C.) 6 F. Supp. 164, and Miller Parlor Furniture Co. v. Furniture Workers' Industrial Union (D. C.) 8 F. Supp. 209. In the first two of these cases the facts are not closely analogous to the facts before us, and in the third case there seems to have been no expressed consideration of the public policy as defined in the Norris-La Guardia Act. For these reasons we do not feel justified in following the conclusions there reached in the respects mentioned. Other similar cases have been called to our attention but we think they do not give proper heed to the declared public policy by which we must be controlled."

The two cases last referred to were decided by the Circuit Court of Appeals, Seventh Circuit. The Rice case was decided on October 26, 1935, and the Lauf case February 29, 1936.

From these decisions, it will be seen that the real question and the only question necessary for decision is whether, at the time these defendants were engaged in picketing plaintiffs' premises, a labor dispute, as defined by chapter 355, L. 1933, existed between the plaintiffs and the defendants or between the plaintiffs and any persons whom the defendants were authorized to represent. Chapter 355 is merely a reenactment by the legislative assembly of this state of what is commonly referred to as the Norris-La Guardia Act. In and by its express terms it applies only to cases in which there is a labor dispute as defined in the act.

Upon the evidence introduced at the trial, the trial court held that there was no labor dispute between the plaintiffs and the defendants or between the plaintiffs and any persons whom the defendants were authorized to represent and, therefore, that the picketing was unlawful and should be restrained.

On page 162 of their brief, the defendants, without stating where the decision may be found, cite the case of *Commonwealth v. Harris*, [23 Pa. D. & C. 254], which, they say, was decided on March 15, 1935, and quote therefrom as follows:

"The stationing of men at or near the plant or shop of the party with whom its workmen have a dispute, to induce other workmen to withdraw from or not to enter its employ, or to induce its customers or the general public to abstain from public relations with it, is a prerogative of the workingman and which will be protected by this court.

"Picketing is a concomitant of the right to organize. And the right of workingmen to organize into associations, and as individuals or as an organization to cease work for any employer, and to use all lawful and peaceful means to induce others to refuse to work for such employer, is a right that can not be questioned. To say that workingmen have the right to organize and to form labor unions, and then deny them the right to picket when they are offended, is equivalent to authorizing a watchman to carry a whistle but to prohibit him from blowing it. Picketing is the articulation of the workingman's protest.

"Picketing is a specific appeal to the public for their approbation and support. It intends to inform the public of the workingman's grievances. No one would dare suggest that labor has not the right by speech to tell the world of its complaints. Picketing differs only in form from free speech, a right guaranteed by the constitution."

This, they say, expresses the union view and is a reasonable view to be taken of the law on this question.

We believe as do counsel that it contains a correct statement of the law on that subject, but the very basis of the decision and reason for the rule announced is the picketing of a plant or shop of a party with whom its workmen have a dispute and, if that condition had existed here, an order restraining the picketing for the purposes there stated would be unlawful and should be reversed. But no such condition confronts us here. The whole evidence in these cases shows that there was no dispute between any one of the plaintiffs and any one of its employees. On the contrary, the whole evidence shows that every employee of the plaintiffs was satisfied with the scale of wages and terms and conditions of his employment; that none of them had ever made a complaint and that, with the exception of possibly three or four of the George B. Wallace Company employees,

none of them belonged or ever had belonged to any labor union and only one of such union men was a member of the Mt. Hood Lodge, Local No. 1005. As to said union members, the evidence shows, they desired to continue to work and would have continued but for said picketing, and that they voluntarily quit when the picketing commenced. Whether since employed, the evidence does not disclose.

Therefore, this is not a case where union members were employed and were dissatisfied with their working conditions and the union, as the representative of its own members, were seeking to change the terms and conditions of employment. In such case, the union, under certain circumstances, would be authorized to represent its own members but in the instant case it had no such authority because none of its members were dissatisfied with the terms and conditions of their employment. No person has authority to represent another unless expressly or impliedly authorized to do so by the person to be represented and, since no member of the union was dissatisfied or desired a change in the terms and conditions of his employment, there was no need for any arbitration or collective bargaining in their behalf and no implied authority for the union to act for them, there being no labor dispute.

The evidence further shows that none of the plaintiffs ever had any contractual relations with any union and that all of them were attempting to run an open shop without, in any way, discriminating between union and nonunion labor. There was, therefore, no labor dispute with any fair meaning of that term, since no controversy or disagreement existed between plaintiffs and their employees.

In these cases, therefore, there was no labor dispute. There was no need of collective bargaining and no desire upon the part of any of said employees to have the defendants act for or represent them in any way, but it is contended that there was a dispute between the defendant union and the plaintiffs because of the fact that plaintiffs' employees were being paid by piece work and not by the hour. The right of an employer to pay his men for the work done by the piece rather than by the hour is purely a matter of contract between the employer and his employees, and, if that method of payment is satisfactory to the employer and to all the employees, no one else has the right to complain much less to attempt to destroy the business of the employer by picketing his premises. There is no evidence which in any way tends to show that the defendants or any of the employees of the plaintiffs ever demanded of the plaintiffs that the men should be paid by the hour rather than by the piece. Nor is there any evidence that the defendants ever requested that the plaintiffs should conform to any union standards or ever disclosed to the plaintiffs what those standards were. Nor is there any evidence that, if the union standards had been adopted by the plaintiffs, the men would have received more pay than that actually received by them for their work or that the terms and conditions of their employment would have been improved or rendered more satisfactory to the employees.

Under these conditions as established by the evidence, I think it is error for the court to now hold, as it must do in order to reverse the decrees of the lower court, that there was a labor dispute within the meaning of chapter 355, L. 1933, and that that act is applicable to the facts of this case. Such a holding, in my

opinion, disregards the very purpose and object of the act and, if the majority opinion is adhered to, it will open the door to all forms of racketeering in cases where both the employer and all his employees are in perfect accord as to their wage scale and terms and conditions of employment and will bring about a condition of affairs destructive of the public welfare. If given that construction, it will render the statute unconstitutional.

Chapter 355, when properly construed and if applied in accordance with its declared policy, guarantees to every man the right to join a union or not as he pleases, and, whether union or nonunion, the right to labor and to every employer the right to operate his business as an open or closed shop without interference by any third party so long as no controversy exists between the employer and any of his employees as to wages, working conditions or hours of employment. Given a different construction, it will result in intimidation, coercion and oppression, and to a denial of the constitutional rights of both the employer and the employee.

For these reasons, I am compelled to dissent from the majority opinion.