Argued September 19, 1956, affirmed January 23, 1957

# LODER BROS. CO. *v.* LODGE 1506 INTERNATIONAL ASSOCIATION OF MACHINISTS

ET AL.

306 P. 2d 411

*Will H. Masters,* Portland, argued the cause for appellant. On the briefs were Masters & Masters, Portland.

*Donald S. Richardson,* Portland, argued the cause for respondents. On the brief were Green, Richardson, Green & Griswold, Portland.

Before WARNER*, Chief Justice, and ROSSMAN, LUSK, BRAND, PERRY** and McALLISTER, Justices.

WARNER, J.

This is an appeal in a suit for an injunction wherein the appellant, Loder Bros. Co., a corporation (hereinafter called "Loders"), as plaintiff, seeks to enjoin the defendant machinists' union, the defendant labor council, certain of their respective officers, in their of-

---

\* Chief Justice when case argued.
\*\* Chief Justice when this decision was rendered.

ficial and individual capacities, and four former employees of plaintiff, from recording the automobile license numbers of customers' cars entering its establishment while the defendants are engaged in picketing plaintiff's place of business, and thereafter sending such customers letters concerning the union's reasons for the strike.

For many years past Loders has been a dealer selling automobiles. The defendant union is affiliated with the International Association of Machinists and has been certified by the National Labor Relations Board as the exclusive bargaining representative of Loder's employees. The defendant labor council is an organization of various unions having jurisdiction of and the right to finally determine certain matters arising out of the labor disputes between the plaintiff and its employees. All of defendants are hereinafter collectively referred to as "the union."

Loder's appeal is from a decree, entered after trial, dismissing its complaint. The appellant makes but one assignment of error. It claims that the court erred in holding that there was no implied threat to do injury to the customers of Loders by taking of the automobile license numbers and by sending the letters concerning the strike to the car owners.

No issue was raised that the instant strike was unlawful or the disagreement between the parties does not constitute a bona fide labor dispute justifying resort to lawful picketing. The only question presented is whether or not the union activities sought to be enjoined are unfair or unlawful labor practices in the sense that they are violative of the peace or constitute departures from the public policy of this state in the exercise of its police powers. The question is not one of right to picket or strike, but rather one of method.

■ All parties admit that even if the right to ultimately adjudicate and terminate the instant labor dispute reposes in the National Labor Relations Board under the Taft-Hartley Act, such authority of the federal agency does not trespass upon nor limit the powers of courts and authorities of this state to deal with and suppress acts of violence or intimidation or coercion or breaches of the peace arising out of this dispute. *International Union Auto Workers v. Wis. Board,* 336 US 245, 253, 93 L ed 651, 69 S Ct 516; *Allen-Bradley Local v. Board,* 315 US 740, 748, 86 L ed 1154, 62 S Ct 820; *Garner v. Teamsters Union,* 346 US 485, 488, 98 L ed 228, 74 S Ct 161; *Weber v. Anheuser-Busch,* 348 US 468, 481, 99 L ed 546, 588, 75 S Ct 480.

There appears to be a general accord that Loders and the union were unable to agree on the terms of a new contract of employment and the union, therefore, called a strike on November 15, 1954. The union then placed pickets before Loder's premises at 465 Center Street, Salem, and also in front of Loder's used car lot across the street from plaintiff's main place of business.

The activities of the patrolling pickets were, in the main, limited to carrying banners which notify the public of the union's reasons for the strike and their open and visible recording of the license numbers of automobiles entering Loder's places of business. These numbers were then given to officers of the defendant union who made them the basis for letters to the car owners stating reasons for the union's strike against Loders.

The evidence does not establish that the pickets obstructed the entrances or stopped persons from entering or that the pickets detained them in order to talk to them against their will. The picketing was en-

tirely devoid of violence or threats of violence and was conducted in a peaceful and law abiding manner unless it can be said that the pickets' action in noting the license numbers on the cars of Loder's customers, followed by the letters from the union, constituted illegal acts giving rise to a species of intimidation which should be restrained.

The appellant, Loder, introduced without objection Exhibits 1 to 4, inclusive. These were letters addressed by the union officers to the automobile owners as such ownership was revealed by the registered license numbers obtained by the pickets. All letters were mimeographed and in text were identical in every respect, except for names of addressees, the date and license number of the automobile alleged to have been driven by the addressee. Because of the weight the appellant imputes to these letters, we set out in full a letter dated January 7, 1955, omitting addressee's name and address and the union's signature. It reads as follows:

"Dear friend: According to our records, a person driving an automobile, license no. —— registered to the above person, crossed our picket line at Loder Bros. Co., 465 Center St. Salem, Oregon.

"We do not believe that you would cross our picket line & support this unfair employer, if you were acquainted with the facts involved.

"The union, during negotiations offered to settle for last years agreement and even agreed to delete two items from the agreement to avoid a labor dipute [sic]. The employer however, insisted on six deletions from the agreement, and on November 15th placed these deletions into effect. 1—Union shop clause. 2—Seniority clause. 3—Armistice day as paid holiday. 4—Saturday as overtime day. 5—40 hour work week guarantee. 6—Paid cover-all program.

"This is a legitimate picket line, sanctioned by the Salem Trades & Labor council & supported by

all organized labor in the Salem area. We respectfully solicit your support in this matter and hope that you will refrain from crossing our picket line again.

"Should you desire additional information concerning thes [sic] dispute, please call 2-7011 or call at room 6, Labor Temple, 445 Center St., Salem, Oregon. Very Truly Yours, * * *."

■ This court has long recognized the right of peaceful picketing when done for a lawful purpose. It has also declared that the mere fact that an employer may sustain a loss of business as a result of such picketing does not warrant judicial intervention. *Wallace v. International Association of Mechanics,* 155 Or 652, 663, 63 P2d 1090. See *Peters v. Central Labor Council,* 179 Or 1, 9, 169 P2d 870.

Strikes and strikers under both federal and state statutes and decisions are favored in their legitimate aspirations and activities. But methods employing intimidation, or its co-relative, coercion, are condemned and penalized or stayed by the injunctive process when appropriate to do so. In the federal aspect see 29 USCA § 158(c) of Labor Management Relations Act of 1947, also known as the Taft-Hartley Act. That section gives great latitude to permissible expression of the labor viewpoint, "if such expression contains no threat of reprisal or force or promise of benefit." Oregon law on the same subject is in like tenor. ORS 662.050 is a part of what we familiarly call the "Little LaGuardia Act." It specifies the acts growing out of any labor dispute which cannot be enjoined. Subsection (5) thereof relates to the publication of the strike and prevents enjoining activities, "Giving publicity to the existence of, or facts involved in, any labor dispute, whether by advertising, speaking, patroling or *any*

*other method not involving fraud or violence or intimidation"*. (Emphasis ours.) Also see *Starr v. Laundry Union*, 155 Or 634, 648, 63 P2d 1104; *Greenfield v. Central Labor Council*, 104 Or 236, 207 P 168.

■ "Intimidation," like "fraud," is difficult to define. What amounts to coercion, intimidation or threats of injury as a restrainable element of a boycott or strike must necessarily depend upon the facts of each particular case. *Baldwin v. Escanaba Liquor Dealers Assoc.*, 165 Mich 98, 130 NW 214, 216; *Lohse Patent Door Co. v. Fuelle*, 215 Mo 421, 114 SW 997, 1005, 22 LRA NS 607.

Were it not for the great reliance the appellant Loder places upon *Wallace v. International Association of Mechanics*, supra, our task in resolving the question presented on this appeal would be relatively simple and our conclusion one of ready affirmation. If the act of recording the automobile numbers was the only union activity to which appellant objects, then we would quickly say that based upon our examination of the record here, an injunction should not issue. So, too, would be our answer if the letters, alone were challenged as intimidatory in character. But here we must view the recording of the car numbers and the after letters of the union to the registered owners as one overt act, if in truth one can derive an overt character from actions which separately give no offense to the law.

The Wallace case is unique and stands alone. Our own search indicates that it is the only case wherein the listing of license numbers of automobiles during the course of a strike was noted by any court with disfavor. We do not find that has ever been cited by the courts of any other jurisdiction as authority for the action the appellant presses us to take in this matter.

So far as we are apprised, there are no cases which condemn directing letters to the owners of such automobiles predicated upon information derived from registration and license records. These observations are confirmed by substantially like statements made by counsel for plaintiffs and defendants in their respective briefs.

The Wallace case was inspired by picketing in connection with a strike by an auto mechanics' union against three different automobile dealers doing business in Portland, Oregon.

The opinion in Wallace, as stated by the court, hinged "primarily upon the construction and constitutionality of the legislative enactment of 1933." (Oregon Laws 1933, ch 355, p 559, and commonly known as the "Little LaGuardia Act") (155 Or 657). It employed about 20 pages confirming the constitutionality of the act and ended with a direction dissolving the injunction from whence the appeal was taken, but retained "jurisdiction to grant injunctive relief *in the event* that picketing is not conducted in a lawful manner." (155 Or 674) (Emphasis ours.)

The decision makes only two references, directly or indirectly, to the taking of automobile license numbers. The first contains the only statement of fact concerning that activity. It is found at p 655 and reads:

"* * * There was evidence, however, that *some unknown persons across the street were listing the license numbers of automobiles of customers* who came to plaintiff's place of business." (Emphasis ours.)

We think it noteworthy that the "number takers" were not identified as any of the defendants, or agents of the defendants, but are rather described as "some *unknown* persons across the street." (Emphasis ours.)

The second and last reference to the "number takers" is on page 672, where the court says:

> "* * * We disapprove of taking the license numbers of automobiles belonging to customers of the plaintiffs, as it may reasonably be interpreted by such customers as an implied threat to do them injury and thereby interfere with the right of the plaintiffs to transact business."

We cannot agree with appellant that the foregoing statement from the Wallace case should be accepted as a declaration of this court, as appellant puts it, "that it is *unlawful* for the pickets to take license numbers of automobiles belonging to customers" of an employer. (Emphasis ours.) The disapproval noted at p 672 does not rise above dictum. The reversal reveals that the final result is in no wise dependent upon the court's "disapproval" of the taking of the automobile numbers. In fact, this court *dissolved* the injunction granted by the circuit court, notwithstanding its so-called "disapproval." An examination of the files in the Wallace case fails to disclose that the point contended for by plaintiff here was presented and argued in the briefs in that case. We also note the statement depended upon by the appellant is made without the support of any authority for its "disapproval."

The appellant, Loder, can find little comfort in the Wallace case. It points to the words which "disapprove of the collection of automobile numbers" but overlooks the action of the court in denying injunctive relief notwithstanding cautionary disapproval (of "number taking"). Thus, appellant is in the anomalous position of now asking us to do in the instant matter what we specifically declined to do in Wallace, i.e., issue an injunction.

Although we find from the record in this appeal

that the acts of the pickets in noting the license numbers in the manner in which they did, were utterly devoid of intimidation, express or implied, or the use of unlawful methods, we are not unmindful that what in the case at bar appears as an innocuous activity, when coupled with or related to some ill-advised collateral action by the pickets, might produce a situation so offensive to law that injunctive relief would be warranted, if the net result of such related action was coercive or intimidatory.

From the Wallace case we learn nothing of the use, if any, made of the numbers after taken down by "unknown persons across the street." (155 Or 655) But in the matter at bar, we find that the numbers became the basis for discovering the names and addresses of the owners of the cars and this apparently for the sole purpose of sending such owners letters of the kind reflected by the exhibit set out above.

If the taking of the numbers, and doing no more, may be appropriately referred to in the Wallace case as an "implied threat," then such implication here is completely negated by the lawful use to which the obtained information was put, i.e., by the character of the letters which the defendants sent to Loder's auto-owning customers. The letters are devoid of any suggestion of threat, or intimidation. They want in offensive language of any kind. No testimony was adduced warranting a conclusion that any customer of Loders was inspired with fear or anxiety by the pickets in recording the customers' license numbers or by any letter after received from the union, nor was there any evidence that the activity of the pickets had interfered with Loder's business relations with such car-owning customers. They were drafted with commendable re-

straint and in a manner setting forth the viewpoint of the union with reasonable clarity and Loders concede that "no direct threat is made" therein. They are purely informatory, not inflammatory. If, perchance, the car owners calling at Loders had erroneously interpreted such action by the pickets "as an implied threat to do them injury" (155 Or 672), certainly their anxieties were dissipated by the letter which they ultimately received from the union.

■■ The law grants immunity from injunction to communications of this character. It provides that parties participating in labor disputes shall be free in "giving publicity to the existence of, or facts involved in, any labor dispute, whether by advertising, speaking, patroling or by any other method not involving * * * intimidation." (ORS 662.050) The right to give such publicity implies the right to give it in a legal manner where and when it will prove the most effective. How else could the unions obtain more exact information as to the ownership of the automobiles visiting the premises of Loders? What more efficient method could defendants employ to advance and explain their cause than to address the employer's customers and to address the members of other labor unions who might otherwise fail to give heed to the picket line and its purpose?

The decree of the circuit court is affirmed.