## No. 14,671.

DENVER LOCAL UNION NO. 13 ET AL. *v.* PERRY TRUCK
LINES, INC. ET AL.

(101 P. [2d] 436)

Decided March 18, 1940. Rehearing denied April 15, 1940.

Mr. PHILIP HORNBEIN, Mr. THEODORE EPSTEIN, Mr. PHILIP HORNBEIN, JR., for plaintiffs in error.

Mr. KENAZ HUFFMAN, Mr. HORACE F. PHELPS, Mr. FRANK J. TRELEASE, JR., for defendants in error.

*En Banc.*

MR. JUSTICE OTTO BOCK delivered the opinion of the court.

THIS is a suit by an employer, operating two truck transportation agencies, joined with eight employees, to restrain plaintiffs in error, hereinafter designated as defendants, from: Placing a picket of any kind or char-

acter on or near the property of the employer or at or near any warehouse, dock or terminal of said employer, or from picketing any operation of the employer; interfering, directly or indirectly, with the receipt, loading or delivery of any shipments handled by said employer; inducing, threatening, coercing or intimidating shippers or receivers of freight to cease patronizing said employer, or to refuse to handle interline freight transported by said employer, or to refuse to tender and deliver to said employer interline freight which they may properly handle; interfering in any manner with the free flow of commerce; going into or near any of the property of said employer; boycotting said employer and his businesses in any manner or form; conspiring against or in any manner interfering with the rights of the employees of said employer to work unmolested by intimidation, coercion, threat, force, violence, or otherwise; interfering in any manner with the property, rolling stock and equipment of said employer.

The trial court issued an ex parte temporary restraining order and after an extended hearing, granted a permanent injunction, which, in its terms, ordered defendants to absolutely refrain and desist from: "Establishing, forming or placing a picket of any kind or character on or near the property of said plaintiffs, Perry Truck Lines, Inc., and J. D. Perry, doing business as the C. & S. Truck Line, or at or near any warehouse, dock or terminal of said plaintiffs, or either of them, or from picketing any operation of said plaintiffs, or either of them, interfering, directly or indirectly, with the receipt, loading or delivery of any shipments handled by said plaintiffs Perry Truck Lines, Inc., and J. D. Perry, doing business as the C. & S. Truck Line, and interfering in any manner with the right of plaintiff companies to pick up and deliver freight for any carrier or carriers, and in particular Hall Motor Freight, Inc., and/or Service Truck Lines; threatening, coercing or intimidating shippers or receivers of freight to cease patronizing said

plaintiffs, or either of them, or to refuse to handle interline freight transported by said plaintiffs, or either of them, or to refuse to tender and deliver to plaintiffs, or either of them, interline freight which they may lawfully handle; interfering in any manner with the free flow of commerce; going upon or near any of the property of said plaintiffs, or either of them; boycotting the customers of plaintiffs, or any of them, or their business in any manner or form; conspiring against or in any manner interfering with the rights of the employees of said plaintiffs, or any of them, to work unmolested, by intimidation, coercion, threat, force, violence or otherwise; interfering in any manner with the property, rolling stock and equipment of said plaintiffs, Perry Truck Lines, Inc., and J. D. Perry, doing business as the C. & S. Truck Line, their connecting and interlining carriers or customers, or any of them." The court found defendant unions and defendant Keigley guilty of contempt for violation of its restraining order.

Defendants assign error, as follows:

"1. That the court committed error in entering judgment for the defendants in error and in granting an injunction herein, for the reason that the court was prohibited from granting an injunction to restrain peaceful picketing and boycotting in a controversy involving a labor dispute by the statute in such case made and provided.

"2. That the judgment of the court was erroneous, in that the plaintiffs in error were enjoined from exercising the right of free speech and free communication, for the purpose of furthering their economic and social interests.

"3. That the court erred in adjudging that there was no labor dispute, and that the statute prohibiting the granting of injunctions against the peaceful communication of information was not applicable, for the reason that a labor dispute may exist, under the express provisions of the statute defining a labor dispute, regardless

of whether or not the disputants stand in the proximate relation of employer and employee.

"4. That the court erred in holding that a controversy existing between a labor union or unions of certain craftsmen or workers and an employer employing the same type of craftsmen or workers does not constitute a labor dispute.

"5. That the court erred in granting an injunction herein, for the reason that there was not only a labor dispute between the union and the employer, but there was an actual strike of the employees of the defendant in error employer, in that five of his employees left the employment of the defendant in error.

"6. That the court erred in granting an injunction herein, not only because the same was in violation of the statutes of this state, but further, for the reason that the same was in violation of established equitable principles existing before the enactment of the statute generally known as the 'Norris-LaGuardia Act.'

"7. That the court erred in holding that a legitimate labor organization was without legal right or authority to use peaceful efforts to attempt to unionize a non-union shop, and that a controversy arising from such legitimate activities of a labor union was not a labor dispute.

"8. That the court erred in holding that it is contrary to the public policy of Colorado and illegal for an employer to request or persuade his employees to become affiliated with an independent labor organization—that is to say, one not controlled, directly or indirectly, by the employer.

"9. That the court erred in holding that the evidence in this case tended to show a secondary boycott.

"10. That the court erred in issuing an ex parte injunction herein.

"11. That the court erred in holding that the plaintiff in error unions and Keigley were guilty of contempt, for the reason that said plaintiffs in error did nothing,

except to peacefully communicate information concerning a labor dispute and controversy between the plaintiffs in error and the defendants in error."

We note, at the outset, that the record does not disclose any force or violence, or any intimidation and threats thereof, on the part of defendants; nor is there any showing of fraud. No contention is made that owing to the number of pickets, or their attitude, there was any intimidation or coercion. Moreover, it is not disputed that force and violence by employees or any organization thereof, never can be sanctioned, and that orderly government cannot exist unless such force and violence, if indulged in, be suppressed by the regularly constituted governmental agency. It is conceded that an employer has a legal right to maintain a nonunion business, and that his employees have a right not to join a union.

We proceed to a discussion of the errors assigned. One of the primary issues raised is whether the facts disclose a "labor dispute" within the meaning of section 87, chapter 97, '35 C. S. A. We state the facts briefly: Plaintiff J. D. Perry is the sole owner of a private intrastate carrier business, and also is president of Perry Truck Lines, Inc., a corporation conducting an interstate common-carrier business, which he manages and in which he owns practically all of the capital stock. Both businesses are nonunion. September 12, 1939, the date on which defendants commenced the picketing, Jack Perry, brother of J. D. Perry, was conducting two similar transportation businesses from the same common dock. His operations were union, under written contract with defendants. To avoid confusion, we shall distinguish the Perry brothers as nonunion Perry and union Perry. Under union Perry's contract, he was required to hire union men in his operations. In pickup service in the city he permitted nonunion Perry, through employees of the business controlled by him, to perform some of the service for him. When commenced, the pick-

eting was against both union and nonunion Perry. At that time two members of defendant's union were employed by nonunion Perry. They, together with at least three other employees who subsequently joined defendant union ceased work for nonunion Perry. They had not personally made any demand upon nonunion Perry for any increase in wages, nor made any other complaints. All negotiations between defendant union and both Perrys had been through defendant Keigley as the business agent of the union. Previously there had been negotiations with nonunion Perry for a closed shop. Eight employees of nonunion Perry, out of approximately twenty-five, joined with their employer in this action. They were satisfied with their employment and wages and did not desire to and refused to join any labor union, and nonunion Perry, as to all of his employees, maintained a neutrality on this question. He neither objected to nor encouraged union affiliation. It is admitted that the primary purpose of the picketing was to bring about the unionization of nonunion Perry's business. After picketing was commenced further negotiations ensued between nonunion Perry and the union representatives, the latter demanding a union contract formulated upon the same basis as union Perry's agreement, in the absence of compliance with which demand the picket line was to continue. Union Perry immediately opened negotiations with the representative of the union, and on the following day this culminated in his removal from the dock and compliance with the union demands, based upon his contract with them, that he employ only union help in his operations. The picketing continued against nonunion Perry until the issuance of the temporary restraining order September 15, 1939, when union Perry rejoined nonunion Perry on their joint dock. Thereafter the pickup business by union Perry, under an agreement with the union, was carried on by a third party, a union concern.

The trial court found that under the facts no "labor dispute" existed, and that, therefore, sections 76 to 87, inclusive, chapter 97, '35 C. S. A. (commonly called the State Norris-LaGuardia Act) had no application to this controversy. On this question we are controlled by section 87 (a), (b) and (c), supra. While subsections (a) and (b) thereof are helpful, subsection (c) has a more direct application to a determination of what is a "labor dispute." It is not an exclusive definition, but is only inclusive. It is as follows: "(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of the employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Prior to the adoption of the federal and state Norris-LaGuardia Acts the judicial conception of a "labor dispute" was based primarily on the construction of section 20 of the Clayton Act (29 U. S. C. A., Labor, §52), which was to the effect that courts had no jurisdiction to issue injunctions to restrain peaceful picketing where the dispute was between employers and employees, but otherwise had such jurisdiction. The Norris-LaGuardia legislation, federal and state, was adopted to allay a deep and bitter feeling on the part of the laboring classes, caused by the narrow construction of the words "labor dispute" by the judicial branch of the government, and it resulted in a more comprehensive definition of the term by legislative action, so as to include all legitimate labor controversies involving all terms and conditions of employment, "regardless of whether or not the disputants stand in the proximate relation of employer and employee." This enlarged definition, to permit peaceful efforts by a labor organization to unionize a particular

business, was foreshadowed by Chief Justice Taft in the case of *American Steel Foundries v. Tri-City Council,* 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189, where this eminent jurist said (pp. 209, 210): "The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda without more, to be without excuse and malicious. The principle of the unlawfulness of maliciously enticing laborers still remains and action may be maintained therefor in proper cases, but to make it applicable to local unions, in such a case as this, seems to us to be unreasonable."

If we had any doubt about such an enlargement, which permits a labor organization to peacefully picket one whose employees are not members of such organization, it is removed by at least three subsequent opinions by the United States Supreme Court. The first case is *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 57 Sup. Ct. 857, 81 L. Ed. 1229. In that case the employer conducted a nonunion shop. He was solicited to enter into a union agreement, but refused. None of his employees was a member of the union conducting the picketing. One of his objections was that the agreement provided that all the work must be done by a journeyman and not by a boss. Senn, who was the boss, claimed that to picket his shop under those circumstances was an interference with his right to work as he saw fit. The court

said (pp. 481, 482): "There is nothing in the Federal Constitution which forbids unions from competing with nonunion concerns for customers by means of picketing as freely as one merchant competes with another by means of advertisements in the press, by circulars, or by his window display. Each member of the unions, as well as Senn, has the right to strive to earn his living. Senn seeks to do so through exercise of his individual skill and planning. The union members seek to do so through combination. Earning a living is dependent upon securing work; and securing work is dependent upon public favor. To win the patronage of the public each may strive by legal means. Exercising its police power, Wisconsin has declared that in a labor dispute peaceful picketing and truthful publicity are means legal for unions. It is true that disclosure of the facts of the labor dispute may be annoying to Senn even if the method and means employed in giving the publicity are inherently unobjectionable. But such annoyance, like that often suffered from publicity in other connections, is not an invasion of the liberty guaranteed by the Constitution. Compare *Pennsylvania Railroad Co. v. United States Railroad Labor Board,* 261 U. S. 72. It is true, also, that disclosure of the facts may prevent Senn from securing jobs which he hoped to get. But a hoped-for job is not property guaranteed by the Constitution. And the diversion of it to a competitor is not an invasion of a constitutional right."

So, in the instant case, the picketing undoubtedly was an annoyance to plaintiff employer, to which, however, he could have no legal objection. It is a civilized substitute for force, which was used, to a great extent, in labor disputes in the nineteenth century, and even now is sometimes resorted to. Moreover, in peaceful picketing the union was using a lawful agency to bring into action the bargaining power of its members and friends, and, if possible, to obtain a union contract with better wage levels and more reasonable conditions of labor.

The record in the instant case discloses that men who belong to a union or who sympathize with its objectives will not cross a picket line. Others prefer not to antagonize a union lest they lose its favor and some business thereby. There is no contention here that the picketing was conducted at a place where it was not lawful. The wage scale of the men who belonged to the union and left their employment after picketing started was thirty cents an hour for a sixty-hour week. Defendants offered evidence of what they considered a reasonable wage scale for this industry, but it was rejected by the trial court. The wage scale and working conditions of plaintiffs' operations reflect themselves in all like operations. The margin of difference between the union scale and plaintiffs' scale might become an important competitive factor with others in like business, so as to force the adoption of the lower scale by those who employ members of defendant's union. The wage scale of union Perry for similar work under the union contract was on a substantially higher level.

The second case, *Lauf v. E. G. Shinner & Co.,* 303 U.S. 323, 58 Sup. Ct. 578, 82 L. Ed. 872, is directly in point on the issues here. The employer and employees complained of wrongs suffered that were more serious than those of which complaint is made in the instant case. The employees seeking the injunction were nonunion, who were free to join or not, as they desired, but who declined to join. The union was not their chosen agency through which to deal with the employer. The refusal of the employer to unionize, and the employees to join the union, caused the union to picket the business. The court, in construing the Wisconsin and federal Norris-LaGuardia Acts, held that there was a "labor dispute," even though none of the employees was a member of the picketing union, and did not desire to become so. Quoting the section of the Wisconsin Act defining "labor dispute," which is exactly like our section 87 (c), supra, the court said (pp. 327, 328):

"The district Court erred in holding that no labor dispute, as defined by the law of Wisconsin, existed between the parties.

\* \* \*

"The District Court was bound by the construction of the section by the Supreme Court of the State, which has held a controversy indistinguishable from that here disclosed to be a labor dispute within the meaning of the statute."

In support of this conclusion, the court cited *American Furniture Co. v. I.B. of T.C. & H. of A.,* etc., 222 Wis. 338, 268 N. W. 250, 106 A. L. R. 335, to which we shall have occasion to refer later.

The third case is *New Negro Alliance v. Sanitary Grocery Co.,* 303 U. S. 552, 58 Sup. Ct. 703, 82 L. Ed. 1012. In this case members of an organization of Negroes, none of whom was employed by the grocery company, carried on picketing because the company would not employ Negro clerks. Apparently, the company employees were satisfied if no Negroes were employed. The purpose of the picketing, none of which was done by employees, was to secure employment for members of the alliance. An injunction was granted by the trial court on the ground that no labor dispute existed within the meaning of the Norris-LaGuardia Act. The Supreme Court rejected this contention and, referring to the Norris-LaGuardia Act, said (pp. 562, 563): "The legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of the act. It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a

direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices. The District Court erred in not complying with the provisions of the act."

In *Fur Workers Union, Local No. 72 v. Fur Workers Union No. 21238*, 105 F. (2d) 1, the United States Circuit Court of Appeals for the District of Columbia had before it the determination of the term "labor dispute." In that case the dispute was between two labor organizations and it involved the question of picketing an employer of members of one of the organizations. The court dissolved the injunction and dismissed the bill. The Supreme Court of the United States, in a memorandum opinion, affirmed this judgment in *Fur Workers Union v. Fur Workers Union* (U. S.), 60 Sup. Ct. 292, citing: *Lauf v. E. G. Shinner & Co., supra; Negro Alliance v. Sanitary Grocery Co., supra; Senn v. Tile Layers Protective Union, supra.*

See, also, *Goldfinger v. Feintuch*, 276 N. Y. 281, 11 N. E. (2d) 910, 116 A. L. R. 477; *Geo. B. Wallace Co. v. International Ass'n of Mechanics*, 155 Ore. 652, 63 P. (2d) 1090; *Schuster v. International Ass'n of Machinists*, 293 Ill. App. 177, 12 N. E. (2d) 50; *American Furniture Co. v. I. B. of T. C. & H. of A.*, etc., *supra.*

Counsel for plaintiffs argue that there can be no "labor dispute" where the sole purpose of the union is to compel an employer to coerce his employees to join a labor union, because an attempt to compel an employer to sign a closed-shop contract against the will of his employees is illegal under sections 76 and 77, chapter 97, supra. We cannot say, from this record, that this was the sole purpose of the union. Many contracts exist between employer and union which relate to wage schedules and hours, but do not provide for a closed shop. Assuming, however, that this is the sole object of the

agencies used by defendants herein to obtain a closed shop, is there any merit to that argument? This same contention was rejected in *Senn v. Tile Layers Protective Union,* and *Lauf v. E. G. Shinner & Co., supra.* It also was rejected in the well-reasoned case of *American Furniture Co. v. I. B. of T. C. & H. of A.,* etc., *supra.*

■ It is generally conceded that the purpose of sections 76 and 77, supra, was to outlaw what was known as the "yellow dog" contract, by which an employer, prior to hiring a person, or thereafter, required him to sign an instrument in which he would promise, as a condition of his employment, that he would not join a labor union during its continuance, and that if he did, he would be discharged. It is now contended by plaintiffs that by the enactment of sections 76 and 77 a union contract for a closed shop without the consent of the employees suffered a similar fate. Such a construction of the act is entirely contrary to its legislative intent and purpose, which was to give labor collective bargaining strength, unattainable by the individual worker owing to his economic dependence and helplessness. The measure was enacted to assure him full freedom of association, without any coercion by the employer. We quote from the declaration of policy in section 76, supra, as follows: "Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor and thereby to obtain acceptable terms and conditions of employment."

■ Counsel for plaintiffs place great reliance, to sustain their contention, on section 77 (a), supra, which denounces certain contracts as against public policy, and which reads as follows: "Every undertaking or promise * * * whereby (a) Either party thereto undertakes or promises to join or to remain a member of some specific labor organization or organizations or to join or remain

a member of some specific employer organization or any employer organization or organizations; * * * is hereby declared to be contrary to public policy * * *."

To elucidate the legislative intent, we quote from section 78 (b) and (j), supra, which denies jurisdiction to a court to issue an injunction prohibiting any person from doing, among others, any of the following acts: "(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in the last preceding section;

* * *

"(j) Advising, urging, or inducing without fraud, violence, or threat thereof, others to do the acts heretofore specified, regardless of any such undertaking or promise as is described in the last preceding section."

"The last preceding section" is the one upon which plaintiffs rely. Clearly, one purpose of the act is to permit the employee to become and remain a member of a labor organization, even should the employer succeed in entering into such an agreement as is condemned in section 77, supra. Its purpose is not to protect unorganized individuals who are the sole employees of one employer, but the right of the employees, regardless of any agreement entered into with the employer, to act through an organization of their own choosing and not one under the domination of the employer, if they so desire.

Counsel for plaintiffs, to sustain this contention, rely greatly on the case of *McKay v. Retail Automobile Salesmen's Local Union No. 1067* (Cal.), 89 P. (2d) 426. California has no Norris-LaGuardia Act, and to that extent the case is not in point as to the issues here involved. In support of its conclusions the California court cites and quotes from *Lauf v. E. G. Shinner & Co.*, 82 F. (2d) 68-72 (C. C. A., Seventh Circuit), remarking, that while the United States Supreme Court in *Lauf v. E. G. Shinner & Co.*, 303 U. S. 323, reversed the judgment of the

Circuit Court of Appeals, it did not disapprove its reasoning as to the purposes of the Wisconsin act. Be that as it may, the Supreme Court at page 330 of the opinion, referring to the declarations of public policy in the Norris-LaGuardia Act and the Wisconsin Labor Code, pointedly said: "We find nothing in the declarations of policy which narrows the definition of a labor dispute as found in the statutes. The rights of the parties and the jurisdiction of the federal courts are to be determined according to the express provisions applicable to labor disputes as so defined."

On rehearing in the McKay case (90 P. (2d) 113), the California court modified its former opinion (89 P. (2d) 426) by stating at page 115: "We did not hold, and there is nothing in the Labor Code which would call for a holding, that a contract between an employer and a labor union would be illegal if the employer agreed to employ union men only."

In that case the court's holding that a contract, if it obligates the employer to discharge employees unless they voluntarily join a labor organization, is invalid, clearly is erroneous, because the agreement denounced in section 77, supra, is one between employer and employees, and not between employer and a labor organization. It also has been the policy of this court to follow the United States Supreme Court, in the event of conflict between decisions of that court and other courts, on questions of first impression. *Post Printing & Publishing Co. v. Denver*, 68 Colo. 50, 189 Pac. 39. We, therefore, follow the conclusion in *Lauf v. E. G. Shinner & Co.*, 303 U. S. 323, *supra.* The Wisconsin anti-injunction act is word for word like that of Colorado. Section 77 (a), supra, is exactly like that of Wisconsin. In referring to this specific issue, the Supreme Court of that state, in *American Furniture Co. v. I. B. of T. C. & H. of A.*, etc., *supra,* has this to say (p. 370): "The law plainly protects not the unorganized individuals constituting the employees, but the right of employees to

act in groups or associations. It deals with the collective effort of employees to better their conditions, and it is only their activities in this direction that are brought within the protection of the statute. The rights of employees not to organize and not to name bargaining agents is neither fostered nor protected. Where the employees have neither organized and named their bargaining representatives nor taken any steps so to organize, we see nothing in the act which prohibits the employer selecting their bargaining agent by contract with a labor union which is not subject to his denomination. Such a step promotes rather than defeats the purpose of the code." In that case the facts were similar to those in the instant case. The employees were not organized, and did not desire to be.

The finding of the trial court in the instant case, that the demand of defendant union of a contract from the employer, whereby the employee promises the employer to join or remain a member of some specific labor organization, is illegal, when applied to the facts in evidence, clearly is erroneous. Moreover, no such contract is now before us. Nor is there evidence in the record that the defendant union requested the execution of such agreement by anyone.

██ Aside from the statutory provisions which we have discussed, the legality of peaceful picketing has its basic roots in constitutional guaranties of liberty and freedom of speech. *People v. Harris,* 104 Colo. 386, 91 P. (2d) 989; *Senn v. Tile Layers Protective Union, supra; In re Lyons,* 27 Cal. App. 293, 81 P. (2d) 190. The importance of preventing restrictions of the enjoyment of these constitutional rights has recently again been emphasized in the case of *Schneider v. State* (U. S.), 60 Sup. Ct. 146. See, also, *Hague v. Committee for Industrial Organization,* 307 U. S. 496, 59 Sup. Ct. 954, 83 L. Ed. 1423. That the duty to prevent these encroachments upon constitutional guaranties, even if the opinions expressed and the actions taken by labor organizations

differ from our own views, rests not only upon the legislative, but also upon the judicial, branch of the government cannot be questioned. That economic loss sustained by an employer because of the lawful exercise of such rights is not recoverable, has clearly been recognized. *Senn v. Tile Layers Protective Union, supra; People v. Harris, supra; Goldfinger v. Feintuch, supra; American Furniture Co. v. I.B. of T.C. & H. of A.,* etc., *supra; Geo. B. Wallace Co. v. International Ass'n of Mechanics, supra.* The constantly growing collective nature of private industry has, unconsciously perhaps, developed the bargaining power of labor, and so long as it is used within lawful bounds, any loss resulting from this competitive struggle is damnum absque injuria.

▆ Plaintiffs contend that the record discloses facts which would constitute an illegal secondary boycott, and such acts may be enjoined. The authorities on this question are divided. The following authorities seem to be in favor of legality: *Lisse v. Local Union No. 31,* 2 Cal. (2d) 312, 41 P. (2d) 314; *In re Lyons, supra; Parkinson Co. v. Building Trades Council,* 154 Cal. 581, 98 Pac. 1027, 21 L.R.A. (N.S.) 550; *Pierce v. Stablemen's Union,* 156 Cal. 70, 103 Pac. 324; *Aeolian Co. v. Fischer,* 27 F. (2d) 560 (affirmed 29 F. (2d) 679); *Lindsay & Co. v. Montana F. of L.,* 37 Mont. 264, 96 Pac. 127, 18 L.R.A. (N.S.) 707; *Goldfinger v. Feintuch, supra; Manhattan Steam Bakery v. Schindler,* 294 N. Y. S. 783, 250 App. Div. 467; *Blumenthal v. Weikman,* 277 N.Y.S. 895, 154 Misc. 684; *Seymour Ruff & Sons v. Bricklayers' M. & P. I. Union* (Md.), 164 Atl. 752; *Smythe Neon Sign Co. v. Local Union No. 405* (Ia.), 284 N.W. 126, 130; *Wilson & Co. v. Birl,* 27 F. Supp. 915.

The provisions in Colorado relating to this question, which make permissive without legal restraint certain acts by any person, are found in section 78, supra, which in part provides:

"(e) Giving publicity to and obtaining or communicating information regarding the existence of, or the

facts involved in, any dispute, whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, without intimidation or coercion, or by any method not involving fraud, violence, breach of the peace, or threat thereof;

"(f) Ceasing to patronize or to employ any person or persons;

\* \* \*

"(h) Advising or notifying any person or persons of an intention to do any of the acts heretofore specified;

\* \* \*

"(j) Advising, urging, or inducing without fraud, violence, or threat thereof, others to do the acts heretofore specified, regardless of any such undertaking or promise as is described in the last preceding section; and

"(k) Doing in concert of any or all of the acts heretofore specified on the ground that the persons engaged therein constitute an unlawful combination or conspiracy."

Under these subsections the union was within its rights to advise or even to induce union Perry not to employ plaintiff nonunion Perry. It also legally could advise or notify Swift & Co., and Armour & Co., of the picketing conducted against plaintiffs. The evidence is that the pickets took the license numbers of automobiles belonging to customers of plaintiffs and notified at least two of them that a picket had been established by the union, and to govern themselves accordingly. If there had been any force or violence or threats thereof in connection with or after such notification, this evidence would be important. Such, however, is not the fact. No pickets were established, nor was any strike called on any customer of plaintiff. There was evidence that approximately a month prior to this occasion, in a controversy with another employer, the defendant union informed the customers that their place would be picketed if they continued to do business with the employer. This did not occur in the instant case. None of them is

a party to this action or seeks relief. There was some evidence—practically all of it based upon hearsay and conclusions of witnesses—that the defendant union had ordered a transportation line operating between Albuquerque, New Mexico, and Los Angeles, California, not to interline its freight with plaintiff. There is no basis in the record to warrant the finding that this occurred at the instance of any of the defendants. There was evidence that union Perry's failure to comply with its union contract to hire only union men resulted in the refusal of members of the union at Kansas City, Missouri, to handle his and nonunion Perry's freight. This, it was admitted, was at the request of defendant's union. Union Perry is not a party to this action. After he complied with his contract, the union members at Kansas City again handled his freight. The unity of interest of members of the same craft belonging to a union to sustain a reasonable wage scale is apparent. In our opinion, the trial court had no authority, under the provisions of section 78, supra, to prohibit these activities by the defendant union. A secondary boycott was defined by the trial court to be a "combination to cause a loss to one person by coercing others against their will to withdraw from him their beneficial business intercourse." See, *Smythe Neon Sign Co. v. Union No. 405, supra.* There is no evidence that anyone having business intercourse with plaintiff was caused to do anything against his will. There is evidence that Armour and Swift did not do any business with plaintiff during the picketing period, but that may have happened for a number of reasons. There was no interference with, or any attempt to ruin, the business of anyone not concerned in the immediate dispute with plaintiffs and the union. The transactions with union Perry and the union were based upon contractual relations, and therefore are not relevant to a secondary boycott. There is no factual basis in this record which makes it necessary to determine the question of secondary boycott. Counsel for plain-

tiffs draw a distinction between "material" boycott and "secondary" boycott, and cite *Smythe Neon Sign Co. v. Local Union No. 405, supra,* and *Goldfinger v. Feintuch, supra.* The argument is advanced that a material boycott may be legal because it relates to a product manufactured by a nonunion employer and is not against the party selling it.

In the Smythe Neon Sign case electrical workers refused to install signs manufactured by the plaintiffs; they were not his employees. It was asserted by the plaintiff that the workers coerced and intimidated its customers so they would not purchase its signs, resulting in a cancellation of contracts. The court says on page 129: "The right of men and women to work and not to work, to organize to promote their common interests and general welfare, to realize their legitimate objectives, to declare, with cause, that persons are unfair to union labor, to refuse to work on products produced by those considered unfair to labor, to refuse to patronize customers of such persons, the right to publish the names of those regarded as unfair to union labor, the right to urge third persons to patronize those friendly to labor, the right to compete with non-union labor for business and to refuse to work with non-union labor, all of these rights are firmly established and secured to union labor by a large majority of the courts of this country." Continuing, the court says (p. 130): "The word 'boycott' does not necessarily import illegality, and a threat to do something that a person has the right to do is not a threat in a legal sense. The combination of the defendants was to do a lawful thing and the means used to accomplish their legitimate objectives were lawful. There was no conspiracy. We find no evidence of coercion or intimidation of third persons by the defendants. If customers or prospective customers refrained from patronizing him, their refusal to patronize him or the withdrawal of such patronage was voluntary. After customers of plaintiff and third persons

received notice that plaintiff was unfair and that defendant electrical workers would do no electrical work on signs manufactured by plaintiff, they were still at liberty to deal or not to deal with plaintiff in the exercise of their free choice."

Plaintiff here is not a manufacturer, but sells transportation. When members of a picketing union urge customers of plaintiff or others in unity of interest with the union not to utilize plaintiff's transportation agency, this is not considered an illegal secondary boycott. The court, in the Smythe Neon Sign case, held such conduct lawful, and under that authority the facts in the instant case do not make out a secondary boycott, but may be termed a "material" boycott.

The trial court found that the placards carried by the pickets, declaring, "This Firm Unfair to Teamsters Local Union No. 13," were highly misleading and false. We cannot agree with that conclusion. This involves only a battle over words. We do not doubt that the employer considered the slogan false. He had the right to entertain that opinion. Under the facts, defendants also had the right to their opinions. The statement on the placards was not fraudulent. *Wilson & Co. v. Birl,* supra. In *Nann v. Raimist,* 255 N.Y. 307, 174 N.E. 690, the Court of Appeals of New York had before it a controversy between two unions in which the falsity of words used by pickets played an important part. The distinguished jurist, Cardozo, after discussing a number of statements claimed to be false, had this to say (p. 318): "'Courts have enough to do in restricting physical disorder without busying themselves with logomachies in which the embattled words are the expression of the opinion of the writer or the speaker. If there is redress for such a wrong, unassociated with wrongful acts, the remedy is not in equity."

Having already said that peaceful picketing, as conducted in the instant case, was not wrongful, a difference of opinion about "fairness" or "unfairness," under

the facts here, is too shadowy or unsubstantial to require repression by a court of equity. In controversies such as this, witnesses sometimes characterize actions by others in words sounding most sinister. Justice Holmes, in speaking about the use of words, in *Towne v. Eisner,* 245 U.S. 418, had this to say: "A word is * * * the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Whether there really is a sinister purpose depends not so much upon the word or words used by the witnesses in their description as upon the actual circumstances, based upon the facts.

Counsel for plaintiffs, to sustain their several contentions, cite a number of cases in which either force or violence was involved, or where the Norris-LaGuardia Acts were not involved. Since those cases are not in point, we think it unnecessary to review them.

█ Plaintiffs challenge the constitutionality of section 78, supra, on the ground that it violates sections 1 and 2 of article VI of the state Constitution. There is no merit in this contention. These sections vest judicial power in the courts in all matters of law and equity. In the enactment of this questioned section the legislature did not deprive the courts of any judicial power which may be defined as the machinery by which persons have their rights determined, nor does this enactment, in general, prescribe rules of practice and procedure in civil cases. It provides that in labor disputes certain conduct dealing with rights, obligations and defenses of persons, as a matter of substantive law, shall not be subject to the harsh remedy of injunctive repression. Legislative attempts to give or deprive courts of jurisdiction, in violation of constitutional provisions, are not involved, as in the case of *Greeley Transportation Co. v. People,* 79 Colo. 307, 245 Pac. 720. The line of demarcation between adjective and substantive law is not always clear, but where constitutional guaranties are involved we have no doubt as to legislative power

to protect such rights. To hold that rules of conduct, as defined in section 78, supra, are subject solely to judicial power, over which legislative agencies have no control, in view of the past legislative history of this state affecting courts, is too revolutionary to warrant serious consideration. Prior to the enactment of the public utilities act courts had jurisdiction to determine controversies relating to reasonable rates and service. Since that enactment exclusive jurisdiction is vested in the commission. Surely, it cannot seriously be contended that this legislative change was an unconstitutional invasion of judicial power. Other illustrations could be given. The same question was decided adversely to plaintiffs' contention in *American Furniture Co. v. Teamsters' Union, supra; Fenske Bros. v. Upholsterers' Union,* 358 Ill. 239, 193 N.E. 112, 97 A.L.R. 1318; *Local Union v. City of Kokomo,* 211 Ind. 72, 5 N.E. (2d) 624; *Geo. B. Wallace Co. v. International Association of Mechanics, supra; Starr v. Laundry Union,* 155 Ore. 634, 63 P. (2d) 1104. The authorities cited by counsel for plaintiffs in support of their contention are not persuasive.

In rejecting the contention that section 78, supra, violates the due-process-of-law clause of the state Constitution we cite; *Senn v. Tile Layers Protective Union, supra; Goldfinger v. Feintuch, supra; American Furniture Co. v. Teamsters' Union, supra; Fenske Bros. v. Upholsterers' Union, supra; Local Union v. City of Kokomo, supra; Geo. B. Wallace Co. v. International Association of Mechanics, supra; Starr v. Laundry Union, supra.* Nor is this section objectionable as being class legislation. *Starr v. Laundry Union, supra.*

 The only remaining question relates to the fine and sentence imposed for alleged violation of the ex parte temporary restraining order. The court made no finding as to what defendant Keigley and the union did or did not do to warrant this punishment. The evidence discloses that at about thirty minutes after service of

the temporary injunction Keigley received a phone call from union Perry, who had returned to the joint dock, asking him to come over and discuss further steps to be taken under the contract with the union, which he did. After an amicable settlement of this dispute, and when leaving the dock, he encountered nonunion Perry, to whom he repeated the terms of the agreement. This led to heated words, in which reference was made by Perry to the temporary restraining order, and a reply by Keigley about his reliance on the National Labor Board. There was no indication, from what was said, that Keigley intended to disobey the temporary injunction; in fact, his acts thereafter indicate that he did comply therewith in every respect. There was some evidence that the previous evening, when nonunion Perry trucks were about to leave Denver, his men became panicky and phoned Perry that they were afraid to leave without protection. A Plymouth car resembling Keigley's auto, occupied by men, was seen being driven around the dock about that time, but there was no positive evidence of identification of Keigley and the car, and he positively denied any connection with the occurrence. At any rate, there was no interference whatever with the trucks by anyone at any place or at any time, and they arrived at their destination without any interference of any sort. We have heretofore referred to evidence concerning interference with interline freight of union Perry and nonunion Perry at other points. Defendants assert that the sentence of Keigley by the court for contempt was to exert pressure on him to prevail upon the Kansas City and Los Angeles unions to do nonunion Perry's work. Be that as it may, there was no force or violence, or any threat thereof, throughout the entire controversy. No attempt was made to stop anyone from going to or leaving the dock. Nothing was said by anyone suggestive of any disrespect to the court. There is no serious conflict in the evidence. The acts of defendants being innocent and permissive under sec-

tion 78, supra, it was beyond the jurisdiction of the trial court to impose punishment for contempt.

We conclude that under section 78, supra, the great weight of most of the recent decisions, and the facts as disclosed by the record, defendants could not legally be enjoined from peaceful picketing, or restrained in their conduct.

The judgment and decree, as well as the judgment for contempt, are reversed and the cause remanded, with directions to dismiss the complaint.

MR. JUSTICE BURKE dissents.