## No. 15,985.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS ET AL. *v.* PUBLIX CAB COMPANY ET AL.

(202 P. [2d] 154)

Decided January 10, 1949.   Rehearing denied January 31, 1949.

Mr. ANTHONY F. ZARLENGO, Mr. ROBERT J. KIRSCHWING, for plaintiffs in error.

Mr. NATHAN R. KOBEY, Mr. ROBERT S. MITCHELL, for defendants in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

FOLLOWING the filing of a complaint in which plaintiffs sought both injunctive relief and damages, the trial court issued a temporary order restraining defendants, who are the plaintiffs in error here (to whom we hereinafter refer as the Union), from doing certain acts including picketing. This was an ex parte proceeding. Ten days later, after a trial, the temporary restraining order was made permanent. Plaintiff, Publix Cab Company (to which we hereinafter refer as Publix or Company), in the meantime joined certain owner-drivers of taxicabs as additional parties plaintiff. The question of damages was reserved for further trial and the defendant union brings the case here seeking a reversal of the judgment.

From the foregoing recital it might be assumed that this was the usual type of labor-management contest. Such is not the case, for here there are involved not the inevitable two elements, but four—three of which are involved in this litigation:

1. Publix, which operates and maintains a taxicab service in the City and County of Denver, is engaged solely in intrastate commerce. It has its headquarters at the Civic Center Garage, 1265 Acoma street, where taxicabs operated for the company are stored, serviced and fueled. At this garage automobiles belonging to finance companies also are stored, and the switchboard maintained by the Company is located in a partitioned room in the building.

2. Publix has six salaried employees who are paid by the week: one washer, one mechanic, three dispatchers, and the manager, Joe Blend. These six employees do not appear as litigants in this proceeding. It will be noted that none of them are drivers of taxicabs because the cabs, with the exception of four, are not owned by Publix but by individual owner-drivers and others.

3. This brings us to a third element, the "owner-driver," which term is defined by counsel for the Union as "an owner of a taxicab in the service of the plaintiff, Publix Cab Company, who also drives the cab on one of the shifts."

4. The fourth element is the "driver," as distinguished from the "owner-driver," who drives a taxicab for an owner-driver in the service of Publix but does not own the car. The evidence disclosed that a cab, except when it is out of commission for repairs or other servicing, is operated steadily twenty-four hours of the day. The driver who owns the taxicab works a twelve-hour shift as a cab driver, and the nonowner-driver operates the taxi for the other twelve-hour shift. This nonowner-driver is chosen by the driver-owner of a cab from those names posted on an extra board. To obtain a place on the extra board, an applicant must be approved by a committee of three selected by the owner-drivers. The owner-driver usually chooses, as the nonowner-driver of his cab, someone whom he knows, or knows about, and who he feels will be a careful driver.

No wages are paid by either the Company or the owner-drivers. The remuneration of the owner-driver and the driver depends upon his earnings during his twelve-hour shift as driver of the cab. Each owner-driver pays the sum of five dollars to the Company for operating his cab for his twelve-hour period, and nonowner-drivers likewise each pay five dollars to the Company for the privilege of operating a cab for their twelve-hour period. Out of this total sum of ten dollars which the Company receives for each twenty-four-hour shift, five dollars

and fifteen cents is retained by the Company in payment for the services it performs and four dollars and eighty-five cents is credited to the account of the owner-driver. This four dollars and eighty-five cents is the payment by the driver to the owner-driver for the use of the latter's cab. Each driver on every twelve-hour shift also pays one dollar into a "wreck fund," which is managed by the drivers and the owner-drivers. All payments are made to Publix, which performs the bookkeeping and separates the payments into the proper accounts. It is obvious that the earnings of each driver, owner or non-owner, depend entirely on the amount of fares each collects. The driver on each shift purchases, if possible, the gasoline for the cab he is operating from the company's Civic Center Garage. Publix furnishes liability insurance and advertising, as well as the call box, a mechanic, and garage space already mentioned. The four cabs owned by Publix are operated by nonowner-drivers under the same contract that the nonowner-drivers have with the owner-drivers, and this arrangement likewise applies to other individuals who own one or more cabs, but who are not owner-drivers.

The foregoing, except for small details, sets forth substantially the method of operation that existed when the Union started negotiations to organize the drivers—both owner and nonowner—in August, 1947. A copy of a tentative union contract, which provided for a closed shop, was submitted to Publix, at which time Bowen, a leading union official, stated he had applications for membership from a majority of the drivers and owner-drivers of Publix. A subsequent vote taken at Union Hall resulted in a twelve to ten vote against the Union; but the Union's position in regard to this election was that it was illegal because persons other than owner-drivers or nonowner-drivers voted. Counsel for Publix did not approve of the form of the tentative contract. He prepared a form of authority, which the drivers could sign if they desired, which the company would

recognize as compatible with the independent contractor relationship. After further modifications by a representative of the Union, an agreement was reached as to the form of authorization. No signatures of the owner-drivers or nonowner-drivers were secured on this form.

In the meantime a second election showed a vote of fourteen to four against the Union. Subsequently more applications for membership in the Union were solicited and Exhibit One consists of fifty signed applications. These included both owner and nonowner drivers, principally the latter. At a meeting on October 9, 1947, between Publix representatives and Union representatives, Publix asked for some evidence of union authority, was shown none, and suggested an election by some official body. There were tentative suggestions that an election be held by the Industrial Commission. At this meeting representatives of the Union, although claiming to represent both the owner-drivers and the nonowner-drivers, suggested that two contracts be drawn—one between Publix and the owner-drivers, in which counsel for the Union would represent the owner-drivers, and a second contract between the owner-drivers and the drivers, in which counsel for the Union would represent the drivers and counsel for Publix would represent the owner-drivers.

On the same day, October 9, 1947, revocation for membership in the Union or authority for the Union to represent them was received by counsel for the Company from nine owner-drivers. The Union thereupon called a strike of the nonowner-drivers. No strike vote had been taken, and the only notice given Publix was a telephone call from the police department that a strike had been called and a picket line established around the Company's garage. Some evidence indicated that language was used that was threatening. It was stated that one of the leaders said he would not be responsible for what happened. The one so accused denied making this statement. There also was testimony of threats to

"sugar" the owner-drivers' cabs, that is, to put sugar in the gasoline tanks thus rendering the gasoline ineffective for ignition or combustion. The pickets were withdrawn when the trial court's restraining order became effective. At the subsequent trial, witnesses of the Union dwelt at considerable length on certain alleged iniquities to which the nonowner-drivers were subjected in the operating arrangements heretofore outlined, such as the fact that a radio fund to which the drivers had contributed had been transferred to the "wreck fund," and that the administration of the "wreck fund" was such that the owner-drivers received the benefit of it as against the nonowner-drivers. An examination of the record, however, shows that no alleged grievance concerning remuneration, conditions, radio fund, payment for gasoline, or any other item was mentioned in the course of negotiations preceding the calling of the strike. The only item discussed previous to the calling of the strike concerned union authority and recognition of the Union. The placards which were carried by the pickets read as follows: "Drivers employed by Independent Contractors are Protesting Low Wages and Conditions. Chauffeurs and Taxicab Drivers Union No. 775." The record is silent as to any negotiations or discussions between the nonowner-drivers and the owner-drivers. Up to the day of the calling of the strike, the Union claimed to represent both groups, but there is no evidence to show that the Union attempted to adjust or negotiate any differences between these two groups. This is corroborated by the testimony of Ray Bowen, the Union leader, as follows : "Q. You made no offer to negotiate with them? A. There wasn't anything to negotiate, they said they did not want me to represent them. Q. But you say you still represented the drivers? A. I represented the drivers and I struck against the owner-operators. Q. But you made no efforts to negotiate for the drivers with the owner-operators, did you? A. No."

In addition to the two pickets carrying placards, there

were large numbers of men congregated before the garage and at one of the Company's stands—forty, according to the testimony of one witness. Regardless of the wording of the placards the pickets were carrying, the owner-drivers and the nonowner-drivers who testified, with one exception, said they thought the strike was against the Company. The Union leaders, Bowen and Pixler, both testified that the strike was called to gain recognition.

The position of the Union is that neither the National Labor Relations Board nor the Industrial Commission of the State of Colorado had jurisdiction of the present controversy. Counsel for Publix had offered voluntarily to submit the matter to the jurisdiction of either the N. L. R. B. or the Industrial Commission. This offer was rejected by the Union. Inasmuch as the operations of Publix were wholly intrastate, it would seem that the authority of the N. L. R. B. could not be invoked unless all parties involved submitted to it on a voluntary basis. The Colorado Peace Act confers jurisdiction on the Industrial Commission only in cases where the number of employees is eight or more. Counsel for the Union argue that the commission therefore has no jurisdiction because Publix has only six employees, and no owner-driver has the statutory minimum in his employ. It is interesting to note that the six individuals, who clearly are employees of Publix, have at no stage of the proceedings been engaged in the controversy. They are the only one of the four elements in this industrial structure that have asserted no claim nor had any claim asserted against them. If these six employees are used as the reason for urging that the Colorado Peace Act is not applicable in this case, then it would seem to be inconsistent to urge that the owner-drivers, as against the Publix, or the nonowner-drivers as against the owner-drivers or Publix, should be treated as employees in this case. If they are classed as such, then their number added to the six who are admittedly salaried employees

of Publix would bring the number of employees within the orbit of the Colorado Peace Act. '35 C.S.A. Supp., c. 94, §§94 (1) et seq. If the drivers are classed as employees for one purpose, it would seem they should be treated as employees for all purposes; and conversely, if the nonowner-drivers do not satisfy the definition of employees, such as to bring them within the purview of the Colorado Peace Act, then there is a question whether they should be treated as employees under any other applicable law. Counsel for the Union thus take this inconsistent position, that the nonowner-driver is not an employee under the Colorado Peace Act, but that he should be treated as one for all other purposes.

■ With the third point urged by counsel for the Union we agree, namely: that members of a labor union have the right to make known the facts of a labor dispute or controversy as an exercise of the constitutional right of free speech. As we said in *Denver Union v. Buckingham Co.*, 108 Colo. 419, 118 P. (2d) 1088: "We recently held, in *Denver Union v. Perry Truck Lines*, 106 Colo. 25, 101 P. (2d) 436, that under the State Norris-La Guardia Act, a labor dispute as therein defined might exist between an employer and a labor union even though there was no controversy between such employer and his own employees. Also, in that case—presaging the holding of the Supreme Court of the United States in *Thornhill v. Alabama*, 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093—we held that peaceful picketing had its basic roots in the constitutional guaranties of liberty and freedom of speech." See, also, *People v. Harris*, 104 Colo. 386, 91 P. (2d) 989, 122 A.L.R. 1024.

In the foregoing cases there was a question as to whether there was a labor dispute, with the emphasis on the word *labor;* in the present case the question is whether there was a dispute at all, with the emphasis on the word *dispute.*

We cannot agree with counsel for the Union that there was a labor controversy between the owner-drivers and

the drivers at the time picketing commenced. Accordingly we do not believe that the following federal cases, cited by counsel, are in point: *American Federation of Labor v. Swing,* 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855; *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 57 Sup. Ct. 857, 81 L. Ed. 1229; and *Bakery and Pastry Drivers v. Wohl,* 315 U. S. 769, 62 Sup. Ct. 816, 86 L. Ed. 1178. It will be noted that in the latter case the union made an effort in good faith to persuade the peddlers of bakery goods to become members. The rules and regulations of the union required that no union member should work more than six days per week. The union then sought an understanding with the peddlers, who failed to join, that they work only six days a week and employ an unemployed union member one day a week. It was only after the failure of these negotiations with the nonunion peddlers of bakery goods that the picketing complained of was commenced. It is also to be noted that the trial court found that the placards carried by the pickets were truthful and accurate in all respects. It is obvious that a genuine dispute had occurred over the six-day week in the handling of bakery products.

In the instant case, as already noted, in the two elections held previous to the strike, a strike had been voted down, no subsequent election was held prior to the calling of the strike, and there is no evidence of any negotiations in good faith between the owner-drivers and the nonowner-drivers prior to the strike. On the contrary, while the pickets' placards contained the statement that the nonowner-drivers were striking against the owner-drivers, the majority of the drivers who testified said they thought they were striking against Publix, that no strike vote was taken, and no notice of intention to strike was given. The notices that the pickets were carrying, therefore, did not set forth the true situation to the public.

In conclusion, it would appear that the situation here presented does not come within the purview of the

Colorado Labor Peace Act and is therefore outside the scope of our opinions in *American Federation of Labor v. Reilly,* 113 Colo. 90, 155 P. (2d) 145, 160 A.L.R. 873, and *Denver Milk Producers, Inc. v. International Brotherhood of Teamsters,* 116 Colo. 389, 183 P. (2d) 529, in both of which the Colorado Labor Peace Act was before us. Our position in this case does not warrant an inference that we are adopting any general rule forbidding strikes or peaceful picketing by employees who, by virtue of the limitation of their number, do not come within the sphere of the Colorado Labor Peace Act. Where, as in this case, the record shows the absence of any negotiations having taken place, or a dispute having occurred, or a statement of grievances having been submitted by the individuals striking and picketing to the individuals against whom the strike is called and against whom the pickets are presumably picketing, we say that it is against the public interest to allow such picketing because a bona fide dispute has not been shown to exist.

The judgment is affirmed.

MR. JUSTICE HILLIARD dissents.